[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAR 3, 2009
THOMAS K. KAHN
CLERK

_____

No. 07-14693

_____

D. C. Docket No. 07-20297-CR-KMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROBERT SHAW,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 3, 2009)**

Before TJOFLAT and CARNES, Circuit Judges, and THRASH,* District Judge.

---

    * Honorable Thomas W. Thrash, United States District Judge for the Northern District of Georgia, sitting by designation.

CARNES, Circuit Judge:

When Robert Shaw was thirteen years old he hurled a rock through a car windshield, sending shards of glass into his victim's face. Fifteen years later Shaw was speeding through Miami, with a cocked and loaded pistol and ski masks, on his way to burglarize a "drug hole." His rap sheet during the intervening years is long enough to require extra postage. It shows 27 arrests involving 62 counts, and sentences totaling at least 105 months in spite of receiving one break after another from the system. Indeed, from Shaw's criminal record it seems as though he is determined to serve a life sentence, albeit on the installment plan. The question this appeal presents is whether the current installment is a reasonable one.

Shaw, who pleaded guilty to being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1), contends that it was unreasonable for the district court to vary upward from the guideline range of 30 to 37 months and impose the statutory maximum of 120 months. More specifically, he complains that the district court relied solely on its own ideas of "how sentencing purposes could best be achieved" instead of giving due weight to each factor outlined in 18 U.S.C. § 3553(a), and that it failed to provide a "significant" justification for the variance.

## I.

### A.

The latest episode in Shaw's extensive criminal history occurred when a Miami-Dade police officer stopped him on December 26, 2006 for speeding. When the officer reached the vehicle he saw Shaw attempting to hide a firearm on the passenger-side rear floorboard. Despite the officer's repeated warnings to keep his hands visible, Shaw lowered his right hand in the direction of the weapon. A search of the car conducted after back-up officers secured Shaw and his two passengers revealed a loaded Browning 9mm pistol—with its hammer back in firing position—and two ski masks. The discovery of the ski masks, which were hidden in a side panel of the center console, prompted a call to the robbery unit.

Shaw was arrested after a records check showed that he was a convicted felon. In a post-<u>Miranda</u> statement to a robbery detective, Shaw admitted that he had been headed toward a nearby drug hole (a place where drugs are being sold). He also admitted that he and his front-seat passenger had discussed burglarizing the drug hole after casing it. Even though he had been seen reaching for the pistol, Shaw denied possessing it and claimed that it belonged to the back-seat passenger.

Shaw pleaded guilty to possession of a firearm and ammunition by a convicted felon. The presentence investigation report set his base offense level for

3

this § 922(g)(1) violation at 14 pursuant to U.S.S.G. § 2K2.1(a)(6). Because Shaw

provided an acceptance of responsibility statement, he received a two-level

adjustment under U.S.S.G. § 3E1.1(a) that brought his total offense level down to

12.

B.

To calculate Shaw's criminal history category, the PSR devoted nine full

pages to recounting his known criminal conduct. Because of its importance in

assessing the reasonableness of Shaw's sentence, we describe that conduct in

detail.

Shaw's first documented incident of criminal behavior occurred in March

1992 when, at age thirteen, he smashed a car windshield with a rock. Glass

fragments peppered the car occupant's face, which led police to charge Shaw with

aggravated assault. Despite the seriousness of the crime and the charge, Shaw was

referred to an alternative program for juvenile offenders for approximately seven

months. This grant of leniency would be the first of many he would receive. And

his response to leniency would be the same each time.

Incidents two and three occurred around the time Shaw completed the

juvenile program in October 1992. On October 10 of that year, four days before

his program ended, he was arrested in connection with an automobile theft and

charged with grand theft of a vehicle. Six days later—and just two days after finishing the juvenile program—the still thirteen-year-old Shaw was arrested for driving a stolen car and charged with grand theft auto. Adjudication was withheld on both counts, and Shaw received another non-custodial sentence when he was placed on community control for approximately nine months.

Incident four involved an August 1994 hit-and-run accident in which Shaw was driving a stolen car. He fled from the scene on foot but was apprehended by officers and charged with criminal mischief. This time the now fifteen-year-old Shaw was convicted, but he was shown mercy yet again in the form of a non-reporting probationary sentence.

A month later in September 1994, incident five resulted in seven charges: two counts each of grand theft vehicle, burglary, and criminal mischief, along with one count of resisting arrest. The PSR does not outline the facts leading to these counts. It does note that they were nolle prossed.

Incident six occurred in May 1995. It involved Shaw's theft of a woman's purse from her truck at a gas station in Miami Beach. He was charged with petit theft and loitering, but the State Attorney's Office did not pursue those charges.

Only six weeks later came incidents seven, eight, and nine. In July 1995 Shaw was linked by fingerprints to an automobile burglary that he had committed

5

the month before. When officers attempted to arrest him for it, Shaw fled on foot. The officers chasing him saw Shaw take a revolver from his waistband and throw it down. Shaw was apprehended the next day as he was attempting to burglarize an occupied residence. These incidents led to seven more charges: two counts each of burglary and criminal mischief; one count of resisting arrest; one count of possession of a firearm by a minor; and one count of carrying a concealed weapon. Even though Shaw's crimes now involved guns and entering people's homes, none of those charges were pursued. The leniency continued, and so did the criminal behavior.

Shaw committed the acts that are incident ten in January 1996, when he was seventeen. During an armed robbery investigation, police stopped a car in which he was riding and found a stolen gun underneath the passenger seat. Shaw had a holster in his pants. He was charged with grand theft and carrying a concealed firearm. Continuing the pattern of leniency, no action was taken on any count.

Seven weeks later, incident eleven took place. Shaw and a partner fled from police officers who came upon them as they were stripping a vehicle. Shaw eventually was caught and charged with burglary, grand theft vehicle, and resisting arrest. Again, no action was taken on the charges.

Two weeks later came incident twelve. Shaw stole several bags from a

6

parked vehicle after breaking its window to enter it. Charged as an adult with grand theft vehicle, criminal mischief, and burglary of an unoccupied conveyance, Shaw received one year of probation after adjudication was withheld. None of the first twelve incidents of Shaw's criminal behavior resulted in a sentence involving any jail time.

Shaw was finally given a jail sentence as a result of incident thirteen. Caught driving a stolen car in December 1996, Shaw, who was eighteen, was charged with grand theft vehicle and resisting arrest. He was found guilty on both counts and given two sentences of 100 days in jail. Those convictions resulted in the revocation of the probation Shaw had received for incident twelve and an additional sentence of 100 days for that earlier crime. All three sentences ran concurrently.

Shaw must not have served his full 100-day sentence, though, because a mere 67 days later in March 1997 he was arrested with two cohorts for attempting to break into a car. For this incident, his fourteenth one—and only the midpoint of his criminal history—Shaw was charged with possession of burglary tools, attempted burglary of an unoccupied conveyance, and resisting arrest. Found guilty, Shaw received two concurrent sentences of nine months in jail.

The longer jail sentence apparently did nothing to dampen Shaw's

7

enthusiasm for criminal pursuits, because he was arrested six times in the year following his completion of that sentence. In January 1998 Shaw, now nineteen, was stopped for incident fifteen after being observed casing parked cars in an area of Miami known for its high volume of stolen vehicles. He was carrying a stolen cell phone and a broken spark plug when he was detained. The State Attorney's Office took no action on the four resulting charges, which included loitering, possession of burglary tools, and two counts of grand theft.

Two months later, following incident sixteen, Shaw was fined and spent twenty-two days in jail after being convicted of petit larceny and obstruction of justice. The PSR does not describe the facts that led to incident sixteen, only the disposition.

The crime spree continued in April 1998 when police once again stopped Shaw for driving a stolen vehicle. Apprehended after fleeing on foot through the City of Miami Shores, Shaw was charged with grand theft for incident seventeen. That charge was not pursued.

In May 1998 Shaw was arrested for incident eighteen. He had livened up his usual car theft routine by breaking the steering wheel of the vehicle in the course of hotwiring it. Shaw was charged with grand theft of a vehicle, possession of burglary tools, and obstructing justice. Between arrest and adjudication for this

8

offense, he found time for the next two criminal incidents.

As for incident nineteen, in July 1998 Shaw stole another car. After his usual flight and capture, he was charged with burglary of an unoccupied conveyance and grand theft. A month later came the arrest for incident twenty. It was Shaw's sixth arrest in seven months. Fingerprints linked him to a car burglary that had happened in June 1998. This incident added another count each of grand theft and burglary of an unoccupied conveyance to his record. Convicted in November 1998 of at least one count each from his May, July, and August arrests, Shaw was sentenced to three concurrent eighteen-month terms of imprisonment. Just a few days shy of his twentieth birthday, Shaw was a convicted felon three times over. And it might have been a lot more times over but for all of the breaks Shaw had been given.

Shaw served about fourteen months in prison before he was released in January 2000. By August of that year (at the latest), he was back at his craft. Incident twenty-one occurred, appropriately enough, when Shaw was twenty-one. On August 10, 2000, police arrested Shaw for driving a vehicle bearing a stolen tag. He attempted to pass blame by using his brother's name as an alias but was convicted of petit larceny and sentenced to five days in jail.

Shaw celebrated Valentine's Day 2001 by leading police on yet another foot

chase following a routine traffic stop. A stolen gun was discovered under the driver's seat of the vehicle Shaw abandoned when he fled. He was twenty-two and using a new alias when this twenty-second incident occurred. Shaw was charged with grand theft and carrying a concealed firearm. Despite his status as a felon, the charges were not pursued.

Several months later in May 2001, Hialeah police stopped a car in which Shaw was riding. They noticed a Hialeah police uniform in the car. It was part of $1,500 worth of property that had been stolen from a vehicle at a local motel. Shaw tried to keep incident twenty-three off his record by using a third alias but ultimately was charged in his own name with grand theft, possession of burglary tools, and burglary of an unoccupied conveyance. As so often had happened during Shaw's continuous criminal career, no action was taken on those charges.

Incident twenty-four occurred in September 2001 after a witness saw Shaw break into a vehicle and crack its steering wheel. When police arrested him, Shaw was back to using his brother's name as an alias. Convicted of grand theft vehicle, possession of burglary tools, and burglary of an unoccupied conveyance, Shaw received three concurrent terms of twenty-one months imprisonment followed by two years probation, the longest sentence he had ever received.

While Shaw was serving his probation in September 2004, witnesses in

10

Coral Gables observed him breaking into a car. That was incident twenty-five for the twenty-five-year-old. Shaw was charged with burglary of an unoccupied conveyance, but the charge was not pursued.

Incident twenty-six followed that November, as Shaw sped off when an officer tried to stop him for running a red light. He was convicted of fleeing a police officer and sentenced to fourteen months imprisonment. As a result, the probation that had been imposed for incident twenty-four was revoked, and Shaw received an additional, concurrent term of fourteen months.

Incident twenty-seven is the one leading to this appeal, the facts of which we have already set out. (As the final brush stroke on the portrait of Shaw's contempt for the law, the PSR also noted his eight traffic convictions and suspended driver's license.)

The PSR assigned Shaw eighteen criminal history points based upon the parts of his record that counted in that calculation. Two points were added to that subtotal because Shaw's § 922(g)(1) conviction occurred less than two years after his release from custody in connection with incidents twenty-four and twenty-six. Shaw's twenty total criminal history points placed him in criminal history category VI.

C.

Recounting Shaw's personal data, the PSR noted that he had no substance abuse problems and no serious physical, emotional, or mental health issues.[1]  It reported that Shaw's grandmother had raised him since infancy and that he maintained a good relationship with her and with his father, whom he considered to be "very supportive of him."  He lost contact with his mother when he was twelve.  Although Shaw had never been married, the PSR reported that he had one daughter and that he voluntarily provided a modest amount of money each month to support her.

According to the PSR, Shaw had used his prison time to further his education, earning a GED and learning masonry and welding.  His father was willing to hire him at the family lawn care business, and Shaw had worked there intermittently during the time he was not incarcerated.  He had no assets or steady income.

The PSR ultimately concluded that Shaw's advisory guidelines range was thirty to thirty-seven months imprisonment. Shaw did not file any objections to the PSR.  And even now he does not contend that it contained any errors.

---

[1] While Shaw indicated that he had been diagnosed in the third grade with bipolar disorder, for which he received intermittent counseling as a child, he did not report any continued effects as an adult.

D.

During his plea colloquy, the district court had informed Shaw that a §

922(g)(1) conviction carried a maximum penalty of ten years imprisonment and

that, regardless of the suggested guidelines range, the court was free to impose a

sentence "more severe or less severe than the sentence called for by the

guidelines." Shaw had acknowledged that he understood the court's disclosures

and pleaded guilty.

At his initial sentencing hearing, the court confirmed that Shaw had no

objections to the PSR and invited him to add anything he wished the court to

consider when determining his sentence. Shaw reiterated that the PSR was

accurate and offered nothing for the court to consider. He did request through his

counsel that he be given a guidelines sentence. The district court then indicated its

"intention to go outside the guideline[s] range" and, based on Shaw's criminal

conduct, to sentence him to the 120-month statutory maximum "under the factors

of [§] 3553[(a)]."[2] Defense counsel requested a one-week continuance to respond

---

[2] Section 3553(a) requires consideration of the following factors:

(1) the nature and circumstances of the offense and the history and characteristics of the
defendant;
(2) the need for the sentence imposed-
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just
punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and

13

to the court's inclination, and the court granted it.

When sentencing resumed, Shaw did not present any supplemental or mitigating evidence. His counsel did point to a decision that he argued prevented the court from departing upward to the sentence the court was contemplating without "extraordinary circumstances," which he asserted did not exist in Shaw's case. The district court explained that it was not considering a departure under the guidelines but instead a variance under 18 U.S.C. § 3553(a). The court calculated Shaw's guidelines range at thirty to thirty-seven months, with which both the government and defense counsel agreed.

Shaw initially declined his opportunity to speak. His attorney spoke instead, telling the court that Shaw wanted to withdraw his guilty plea if the court intended to impose the statutory maximum sentence. The court insisted that Shaw speak for himself, so he did: "I took the plea, not because I was guilty-- I took that plea because it was in my best interest." In response, the court noted that Shaw had

---

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[;]
(5) any pertinent policy statement[;]
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

admitted to the accuracy of the government's evidence against him and knew from the plea colloquy that 120 months was one sentence option. The court did not consider what it characterized as Shaw's "change of heart" about the plea to be a valid basis for setting it aside.

Proceeding to the actual sentence, the district court highlighted Shaw's use of ten aliases and five birthdates to aid his criminal career. It then recited the facts and circumstances relating to each of Shaw's arrests as outlined in the PSR, taking particular note of the many arrests for which Shaw had received no punishment, the several occasions on which he had possessed a firearm, and the fact that lulls in his criminal conduct had occurred only when he was incarcerated. Defense counsel acknowledged the court's statements were accurate.

With that factual foundation, the court laid out the factors it considered in arriving at Shaw's sentence: (1) "[t]he nature and circumstances of the offense," including its seriousness; (2) Shaw's "history and characteristics"; and (3) whether the sentence would "promote respect for the law," "afford adequate deterrence to criminal conduct," and "protect the public" from Shaw's further crimes.

The district court emphasized that for fifteen years Shaw had shown disrespect for the law by repeatedly engaging in criminal conduct, which often involved resisting arrest and carrying firearms. It noted that Shaw's previous

15

convictions and incarcerations had failed to deter him from returning to crime. Further, the court spoke of the public's need to be protected from Shaw, given his ability to make "his presence felt in a very damaging and detrimental way" all across Miami-Dade County.

Finally, the court found that although Shaw had not yet "seriously maimed or injured somebody" with the weapons he carried, he was a mere "step or two away from that violence occurring." The public did not have to wait for more substantial violence to materialize before the court could "impose a sentence that [was] adequate to protect the public from [Shaw's] further crimes." Emphasizing Shaw's choice to decline his "many, many, many, many, many chances" to change his behavior, the district court sentenced him to 120 months imprisonment, 5 years supervised release, and a $100 special assessment. He got the statutory maximum.

## II.

We review sentencing decisions only for abuse of discretion, and we use a two-step process. First, we review to "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence—including an explanation for any

16

deviation from the Guidelines range." Gall v. United States, 552 U.S. ___, 128 S. Ct. 586, 597 (2007); United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008). If we find the sentence procedurally sound, the second step is to review the sentence's "substantive reasonableness" under the totality of the circumstances, including "the extent of any variance from the Guidelines range." Gall, 128 S. Ct. at 597. Sentences outside the guidelines are not presumed to be unreasonable, but we may take the extent of any variance into our calculus. Id.

The district court must evaluate all of the § 3553(a) factors when arriving at a sentence, id. at 596, but is permitted to attach "great weight" to one factor over others. Id. at 600; Pugh, 515 F.3d at 1192. In assessing the factors, the sentencing court should remember that each "convicted person [is] an individual and every case [is] a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Gall, 128 S. Ct. at 598 (internal quotation marks omitted). When the district court decides after "serious consideration" that a variance is in order, it should explain why that variance "is appropriate in a particular case with sufficient justifications." Id. at 594. The justifications must be "compelling" enough "to support the degree of the variance" and complete enough to allow meaningful appellate review. Id. at 597. But the Supreme Court has specifically rejected the idea that an extraordinary justification

17

is required for a sentence outside the guidelines range. Id. at 595.

Because of its "institutional advantage" in making sentence determinations, id. at 597–98, a district court has "considerable discretion" in deciding whether the § 3553(a) factors justify a variance and the extent of one that is appropriate. Pugh, 515 F.3d at 1191. We must give its decision "due deference." Gall, 128 S. Ct. at 597; Pugh, 515 F.3d at 1191. We may vacate a sentence because of the variance only "if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." Pugh, 515 F.3d at 1191 (internal quotation marks omitted). However, that we "might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal." Gall, 128 S. Ct. at 597.

### III.

Shaw does not contend that the district court committed any procedural error. He agrees that the court's guidelines calculation was correct and so do we. The court considered the § 3553(a) factors and thoroughly explained its reasons for varying upward and imposing the 120-month maximum sentence permitted by the statute Shaw violated. Shaw's only contention is that the court's decision to impose 120 months imprisonment is substantively unreasonable.

18

Shaw's attacks on the substantive reasonableness of his sentence are of two types. The first type is an argument that the sentence was determined, or at least influenced, by an erroneous premise or prediction. In explaining the reason for the upward variance the district court acknowledged that Shaw's extensive record did not show "substantial violence" but added: "I can only tell you that, from my experience, with this kind of record, we are a step or two away from that violence occurring." Shaw faults the court for "not accompany[ing] this observation with a citation to any empirical study establishing that non-violent repeat offenders do tend, in reality, to become violent ones."

There is no requirement that sentencing judges confine their considerations to empirical studies and ignore what they have learned from similar cases over the years. Indeed, one of the reasons district courts are given such wide latitude in sentencing is their experience in handling criminal cases. See Koon v. United States, 518 U.S. 81, 98–99, 116 S. Ct. 2035, 2046–47 (1996) (putting value on a district court's "vantage point and day-to-day experience in criminal sentencing"); cf. Buford v. United States, 532 U.S. 59, 65, 121 S. Ct. 1276, 1280 (2001) (discussing the reason for the abuse-of-discretion standard); Wilton v. Seven Falls Co., 515 U.S. 277, 288–89, 115 S. Ct. 2137, 2143–44 (1995) (same).

In any event, Shaw's argument that there is no basis for believing that he

19

was a step or two away from committing a violent crime runs afoul of the facts. When arrested for this crime Shaw, who was driving, and two other men were headed to a drug hole to burglarize it. They had ski masks in their possession, evidencing that they thought people might be there. Shaw also had a loaded Browning 9mm pistol with its hammer back in firing position, evidencing that he was ready to use deadly force if necessary to carry out the crime. When pulled over by the police, Shaw and the other two were in the area of the intended crime scene and were getting closer every second. The district court had abundant basis for concluding that Shaw was only a figurative step or two away from committing a crime of violence.

Against the weight of these facts and the district court's experience with similar cases in the past, Shaw cites to a study that he claims shows only 19.9 percent of non-violent offenders re-arrested within three years of release were re-arrested for violent offenses. We doubt that a single study, or even a number of them, should be allowed to override a sentencing court's experience, but putting that aside, the study Shaw relies on has little relevance to this particular case. That study, conducted by the Bureau of Justice, covered a group of offenders who had left state prison after serving sentences for non-violent crimes. See U.S. Dep't of Justice, Bureau of Justice Statistics, Profile of Nonviolent Offenders Exiting State

20

Prisons (2004), available at http://www.ojp.usdoj.gov/bjs/pub/pdf/pnoesp.pdf.[3]  It included the whole gamut of non-violent crimes, which were defined to include drug crimes among others, regardless of whether the released inmate was a first offender or a recidivist.  It did not purport to predict the likelihood of a violent offense being committed by someone, like Shaw, with a continuous criminal career consisting of twenty-seven known criminal incidents culminating in his heading toward a drug hole with ski masks and a cocked and loaded firearm.  The study did not purport to predict that non-violence would be the result of releasing a one-man crime spree like Shaw, whose record includes multiple criminal incidents in which he had a weapon.

Shaw also cites against the district court's finding that he was only a step or two away from committing a violent crime a statement in a Fourth Circuit opinion that "less than 1% of all nonviolent offenders are later arrested on murder or rape charges." Jones v. Murray, 962 F.2d 302, 308 (4th Cir. 1992).  What that opinion actually said is that the plaintiff inmates in that case had presented statistics purporting to show that. Id. ("According to statistics presented by the inmates . . . ."). While the court may have assumed that the statistics were true for the sake of argument, it held in favor of the defendants on the DNA issue for which the

_____

[3] Copies of the internet materials cited in this opinion are on file in the Clerk's Office.  See 11th Cir. R. 36, I.O.P. 10.

21

plaintiffs had offered those statistics.  See id.  In any event, as we have explained,

Shaw is not "all nonviolent offenders."  Besides, the district court did not say that

he was a step or two away from committing murder or rape.  From the facts that

gave rise to this case it would appear that the violent crime Shaw was closest to

committing was armed robbery.

The second type of unreasonableness attack Shaw makes is of the traditional

kind.  His primary argument is that the district court relied too much on recidivism,

which is how Shaw's counsel describes his single-minded devotion to a life of

crime exemplified in twenty-six known episodes of criminal behavior flowing in a

steady stream from the age of thirteen to this arrest a decade and a half later.  That

recidivism was the single most important factor in the court's decision to vary

upward from a guidelines range of 30 to 37 months to a sentence of 120 months.

Shaw's counsel admits that he had one-and-a-half times the number of

points required to come within criminal history category VI, the highest one.  At

oral argument counsel for Shaw conceded that an upward departure or variance

because of Shaw's unbroken string of crimes was within the court's discretion.[4]

---

[4] Under questioning Shaw's counsel said this at oral argument:  "Let me make a concession, Judge Carnes. Because of his unbroken string of crimes—not quite unbroken but we'll use that phrase now, the, the, uh— he scored out under the guidelines which are very minute about this situation."  After agreeing with the panel's statements that Shaw had seven more points (fifty percent more) than he needed to reach criminal history category VI, Shaw's counsel continued: "Yes, and as I said let me make a concession: under this court's case law offenders who fall in that situation are-- this court has upheld upward departures for defendants

22

See generally United States Sentencing Guidelines § 4A1.3 cmt. n. 2(B) (Nov. 2006) ("In the case of an egregious, serious criminal record in which even the guideline range for Criminal History Category VI is not adequate to reflect the seriousness of the defendant's criminal history, a departure above the guideline range for a defendant with Criminal History Category VI may be warranted."); United States v. Irizarry, 458 F.3d 1208, 1211–12 (11th Cir. 2006) (affirming an upward variance based on a district court's conclusion that a guidelines sentence was inadequate to address one specific § 3553(a) factor, the need to protect the public from further crimes of the defendant); United States v. Mellerson, 145 F.3d 1255, 1257 (11th Cir. 1998) (affirming an upward departure where a defendant had forty criminal history points instead of the thirteen needed to reach category VI); United States v. Santos, 93 F.3d 761, 763 (11th Cir. 1996) (affirming an upward departure where a defendant's twenty-one criminal history points "far exceeded" the points needed for category VI). When pressed, however, counsel declined to say how much upward departure or variance was reasonable in this case, preferring to insist that going from 37 to 120 months was too much, without advising us how much too much it is. In other words, his complaint is not so much about the court

---

who have scored above the thirteen threshold on the criminal history. And the district judge would have had some discretion based on that case law, based on the differential, to depart upward . . . ."

23

throwing the book at Shaw as it is about the size of the book that was thrown. But he would rather not say how large a book the district court reasonably could have thrown.[5]

Given all of the circumstances, which were adequately recited and taken into account by the district court, its decision to vary upward to the maximum sentence permitted by the statute was reasonable. The court's methodical review of the § 3553(a) factors makes clear that it did not disregard any of those factors. It discussed in some detail Shaw's history and characteristics and talked about the nature of his offense, highlighting the fact that he had committed similar crimes before.[6] The court found that more punishment was needed for deterrence and to promote respect for the law. It remarked that shorter sentences had done nothing to get Shaw off his determined course of crime and had not been enough to protect the public from his lawlessness. Although the court did not explicitly address the need to provide Shaw with vocational or educational training, it knew from the PSR about the skills Shaw had acquired during earlier incarcerations, skills he repeatedly wasted by choosing—over and over again—a life of crime.

Shaw asserts that his sentence was unreasonable because in the past we have

---

[5] We do not mean to imply that counsel for Shaw did anything less than an admirable job in tenaciously representing him in this appeal. His advocacy is a credit to the profession.

[6] In fact, Shaw had not only committed crimes like this one before, he had committed precisely this same crime at least one other time but had not been charged for it.

24

affirmed sentences that amounted to a smaller percentage increase than the variance in this case. Three of the four decisions that he cites are guidelines departure cases decided before the decision in United States v. Booker, 543 U.S. 220, 125 S. Ct. 738 (2005). See United States v. Jones, 289 F.3d 1260 (11th Cir. 2002); Mellerson, 145 F.3d at 1257; Santos, 93 F.3d at 763. This is not a pre-Booker guidelines departure case, but a post-Booker § 3553(a) variance decision. The fourth decision he cites is post-Booker but it is an unpublished decision, which is not precedential. In any event, even assuming that the circumstances in those four cases measured up to or exceeded those in this case, in each of those four cases we affirmed the sentence imposed. In none of them did we conclude that the sentence was unreasonable. Therefore, even if all four decisions had been post-Booker, published opinions involving upward variances, the fact that we affirmed those variances would not support Shaw's argument that we should not affirm this one.

The sum and substance of it is that Shaw started down the road of his criminal career before he was old enough to drive, and he has single-mindedly steered that course into his late twenties despite being offered at least twenty-six opportunities to exit from it. The legal system has responded to Shaw's unwavering desire to commit crimes in various ways over the years: by referring

25

him to a juvenile program; by formally nolle prossing charges; by simply not pursuing charges; by pursuing charges but withholding adjudication; by giving him a non-reporting probationary sentence for the charges; by giving him a reporting probationary sentence; and by imposing jail and prison sentences. No matter what the system's response to Shaw's criminal behavior has been, his reaction to it has always been the same—to commit more crimes. The only significant periods of time when society has not been victimized by Shaw's crimes have been when he was behind bars.

Shaw's latest crime only accentuates the need to protect society from him. It shows, as the district court noted, that he is just a step or two away from violent crime. The public should not have to wait until Shaw takes those last steps before the district court can provide it with the maximum protection the law allows. The 120-month sentence that the district court imposed was not unreasonable.

**AFFIRMED.**