[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-12684
Non-Argument Calendar
_____

D.C. Docket Nos. 3:16-cr-00125-TJC-PDB-1,
3:16-cr-00141-TJC-PDB-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JOSE SALVADOR LANTIGUA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 20, 2018)

Before TJOFLAT, JILL PRYOR and NEWSOM, Circuit Judges.

PER CURIAM:

Jose Salvador Lantigua was sentenced to 168 months' imprisonment, a significant upward variance from his applicable Sentencing Guidelines range, after he pled guilty to conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349; bank fraud, in violation of 18 U.S.C. § 1344; passport fraud, in violation of 18 U.S.C. § 1542; and aggravated identity theft, in violation of 18 U.S.C. § 1028A.  On appeal, Lantigua argues that the district court erred by imposing a procedurally and substantively unreasonable sentence.  After careful review, we affirm.

## I.    BACKGROUND

### A.    The Fraudulent Scheme

In April and August 2012, Lantigua applied to borrow $2 million in loans from Fidelity Bank (formerly known as American Enterprise Bank), a federally insured financial institution in Jacksonville, Florida.  During the application process, Lantigua submitted a false and fraudulent statement of a life insurance policy from Hartford Universal Life, reflecting a cash value of more than $2.4 million, and a false and fraudulent statement of his personal assets and liabilities.  Under the loan agreements, Lantigua assigned life insurance benefits as collateral.  Based upon the false information provided to the bank, the loans were approved and funded.

In early 2013, with his business financially suffering and having borrowed $2 million based on fraudulent documents, Lantigua decided to fake his own death and allow his family to collect his life insurance benefits to pay off his outstanding debt. He told his wife, Daphne Simpson, that he suffered from a fatal brain disease and had one year or less to live. He said that he could travel to South America to undergo a potentially life-saving treatment.

Shortly before his trip, Lantigua revealed to Simpson that he had no brain disease, but he continued to lie to her. He told her that his military past was catching up with him. He explained that he had led an Army special operations team, his team had taken out a drug cartel leader, and he was being blackmailed by a rogue CIA agent. Lantigua told Simpson he had been blackmailed into paying money to avoid exposure to the alleged cartel leader's son. He also said that members of his former team had already been killed and warned Simpson that both of their families were in danger. Simpson believed the fabricated military story and agreed to help him out of fear for their families by applying for Lantigua's life insurance benefits after he secured a sham death certificate.

Lantigua flew to Venezuela, where he obtained the fraudulent death certificate and a fraudulent certificate of cremation. Simpson met Lantigua in Venezuela and used the fraudulent death certificate and certificate of cremation to

obtain a certificate of death abroad from the U.S. Embassy. She then returned to the United States with the fake certificates.

Simpson submitted false claims to seven life insurance companies, representing that Lantigua had died in Venezuela. She directed Lantigua's attorney, who was unaware of the scheme, to prepare the documents necessary to seek death benefits from the life insurance companies. The cumulative value of these policies exceeded $6.6 million, but only three of the companies paid death benefits, so Simpson only received $871,067.11. Simpson and Lantigua's unwitting attorney went to federal court in an attempt to obtain payment on at least some of the policies.

Meanwhile, Lantigua illegally returned to the United States by paying an individual $5,000 to take him from the Bahamas to Florida on a fishing boat. Lantigua and Simpson then traveled to their second home in North Carolina, where Lantigua used a New York driver's license and birth certificate in the name of "Ernest Allen Wills" to obtain a North Carolina driver's license in that name. He used his fraudulent driver's license to apply for a passport in Wills's name. Officials with the U.S. Department of State caught on to Lantigua's fraudulent passport application, and law enforcement arrested him in North Carolina. Lantigua pled guilty to one count each of conspiracy to commit mail and wire fraud, bank fraud, passport fraud, and aggravated identity theft.

4

B.    **The Sentencing Hearing**

In preparing the Presentence Investigation Report ("PSI"), a probation officer calculated a total offense level of 24 for Lantigua's convictions for conspiracy to commit mail and wire fraud, bank fraud, and passport fraud. This calculation included 18 levels based on an intended loss amount of over $8 million, as well as a three level reduction for Lantigua's acceptance of responsibility. With a total offense level of 24 and a criminal history category of I, the calculated guidelines range for Lantigua's conspiracy, bank fraud, and passport fraud convictions was 51 to 63 months' imprisonment. The guidelines sentence for Lantigua's aggravated identity theft conviction was 24 months consecutive to all other counts, making the total guidelines range 75-87 months. *See* U.S.S.G. § 2B1.6.

The district judge who sentenced Lantigua was the same judge who had presided over the civil cases through which Simpson fraudulently had attempted to recover benefits under Lantigua's life insurance policies. At the sentencing hearing, the district court noted its familiarity with Lantigua's case based on the previous civil cases. The court adopted the guidelines calculation in the PSI without objection from either party. The court entertained extensive argument from the government and defense counsel and reviewed statements from victims of Lantigua's fraud, including Fidelity Bank, Five Star Insurance, and Michael

5

Wienckowski, a former friend who had loaned over $1.7 million to Lantigua. Even though Wienckowski was not a victim of the counts of conviction, he and his wife spoke at the sentencing hearing about the money they lost as a result of Lantigua's fraud and through litigating against Lantigua and Simpson to recover against them for the fraud.

The district court at length considered the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553(a).[1] The district court explained that the intended loss amount under the Sentencing Guidelines was a large sum of money, approximately $8.6 million, and the actual loss was over $2.8 million. It was this loss amount, the court explained, that drove Lantigua's guidelines range. As to § 3553, the court specifically addressed *each* factor in § 3553(a), describing in detail the nature and circumstances of Lantigua's offenses and his history and characteristics. The court explained that Lantigua had "served with distinction in the military and then became a respected and valued member of his community" but then was "convicted of committing a particularly pernicious fraud which counts as its victims banks, insurance companies, governmental agencies, his

---

[1] The factors delineated in 18 U.S.C. § 3553(a) include the nature and circumstances of the offense and history and characteristics of the defendant; the need for the sentence imposed to afford adequate deterrence to criminal conduct, to protect the public from further crimes by the defendant, and to provide the defendant with needed educational or vocational training; and the kinds of sentences available and established sentencing ranges. *See* 18 U.S.C. § 3553(a)(1)-(5).

6

friends, his family, and even this very court." Doc. 52 at 88.[2] The district court commented that Simpson, at Lantigua's urging, had "duped" a law firm into advocating "in both state court and this court" for payment on the insurance policies. *Id.* at 91. Relatedly, the court stated that "[t]hese lawsuits and the events surrounding them caused the insurance companies and creditors, including the bank, and also Mr. Wienckowski, to embark on a massive and expensive investigation." *Id.* at 92. The court noted that Lantigua had cooperated with the government and was remorseful. Nonetheless, it explained the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and serve as a deterrent. The court, noting that Lantigua was "unlikely, given these circumstances, [to] commit another fraud," stated that specific deterrence was "not a big issue." *Id.* at 95.

After considering these facts and the remaining § 3553(a) factors, the court determined that a within-guidelines sentence was "insufficient to account for the gravity of the offense, . . . all the persons who suffered, . . . the use of the court's system to try to achieve fraudulent ends, and all of the attributes of the fraud." *Id.* at 96. Thus, even "tak[ing] into account [ ] Lantigua's cooperation and his apparent remorse" and that he "did live a crime-free life . . . really, an upright life, as far as we know . . . until he started down this road," the district court determined

---

[2] "Doc. #" refers to numbered entries on the district court's docket.

that a total sentence of 168 months' imprisonment, consisting of 144 months for the fraud offenses and 24 consecutive months for the aggravated identity theft, was appropriate.  *Id.* at 97.  The sentence the court imposed represented an 81-month upward variance from the top of Lantigua's guidelines range.  Lantigua objected to the upward variance, arguing that it "produce[d] a sentence that is unreasonably excessive."  *Id.* at 110.

In its Statement of Reasons, filed after sentencing, the district court noted the following § 3553(a) factors and other reasons for a variance:  the nature and circumstances of the offense, specifically, Lantigua's "[e]xtreme [c]onduct"; the need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need to afford adequate deterrence to criminal conduct; and the need to protect the public from further crimes of the defendant.  Doc. 83 at 3.

This is Lantigua's appeal of his sentence.

## II.    STANDARDS OF REVIEW

We generally review the reasonableness of a sentence for an abuse of discretion.  *See Gall v. United States*, 552 U.S. 38, 51 (2007).  First, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a

8

sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ."  *Id.*

As relevant to this appeal, we review *de novo* one aspect of procedural reasonableness:  whether the district court complied with 18 U.S.C. § 3553(c)(2), which requires it to adequately explain the chosen sentence.  18 U.S.C. § 3553(c)(2); *see United States v. Bonilla*, 463 F.3d 1176, 1181 (11th Cir. 2006) (reviewing *de novo* a district court's compliance with § 3553(c)(1), which applies to within-Guidelines sentences rather than variances, regardless of whether the defendant objected in the district court).  Specifically, § 3553(c)(2), which applies when the district court imposes an upward variance, requires the district court to "state in open court the reasons for its imposition of the particular sentence" and "the specific reason for the imposition of a sentence different from that described" in the Guidelines.  18 U.S.C. § 3553(c)(2).  The specific reason for the variance also must be "stated with specificity in a statement of reasons."  *Id.*

Second, we must determine whether the district court imposed a substantively reasonable sentence.  A district court's sentence is substantively unreasonable when it (1) "fails to afford consideration to relevant factors that were due significant weight," (2) "gives significant weight to an improper or irrelevant factor," or (3) "commits a clear error of judgment in considering the proper

9

factors" by considering proper factors but balancing them unreasonably. *United States v. Irey*, 612 F.3d 1160, 1189 (11th Cir. 2010) (en banc).

## III.   DISCUSSION

On appeal, Lantigua argues that his sentence is both procedurally and substantively unreasonable. As to procedural reasonableness, Lantigua contends that the district court failed to comply with § 3553(c)(2) by inadequately explaining the sentence imposed. As to substantive reasonableness, Lantigua argues that the district court weighed improper factors and balanced proper factors unreasonably. We address his arguments in turn.

## A.   Procedural Reasonableness

Lantigua argues that the district court erred because it failed to explain adequately the upward variance. Specifically, he argues that an inconsistency between the district court's oral pronouncement at sentencing and its written Statement of Reasons created an ambiguity in the record that prevents meaningful appellate review and requires resentencing. During the sentencing hearing, the district court stated that the need to deter Lantigua from committing additional crimes, a sentencing factor listed in § 3553(a)(2)(C), was "not a big issue" because it was unlikely that he would commit fraud in the future. Doc. 52 at 94-95. But in the Statement of Reasons completed after sentencing, the district court checked the box indicating that the need for the sentence to "protect the public from further

10

crimes of the defendant (*18 U.S.C. § 3553(a)(2)(C)*)" was among the factors justifying the upward variance. Lantigua argues that this inconsistency requires resentencing. We are unpersuaded.

If a district court determines that a sentence outside the guidelines range is warranted, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50. "After settling on the appropriate sentence, [the district court] must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.*; *see* 18 U.S.C. § 3553(c)(2). And the district court must provide written explanations in a Statement of Reasons. 18 U.S.C. § 3553(c)(2). If an orally pronounced sentence conflicts unambiguously with the Statement of Reasons, the oral pronouncement will govern. *United States v. Bonilla*, 579 F.3d 1233, 1245 (11th Cir. 2009).

Lantigua argues that the oral pronouncement and the Statement of Reasons take conflicting positions on the role of deterrence in his sentence, making our review of the reasonableness of his sentence impossible. But the two are not unambiguously in conflict. Even though the district court minimized the role of specific deterrence as a justification for varying upward during the sentencing hearing, it did not entirely disregard that factor. The district court's statement that it was "unlikely" that Lantigua might reoffend was not inconsistent with its

11

notation in the Statement of Reasons that it varied upward "[t]o protect the public from further crimes of the defendant." Doc. 52 at 95; Doc. 38 at 3.

To the extent an orally pronounced sentence is ambiguous, "it is proper to look to the written judgment to ascertain the court's intentions." *Bonilla*, 579 F.3d at 1245 (internal quotation marks omitted). Here, because there was no direct conflict, to the extent the district court's oral pronouncement was ambiguous with reference to specific deterrence, the Statement of Reasons clarified the district court's intent to rely, at least in part, on specific deterrence in varying upward from Lantigua's guidelines range. Lantigua has not, therefore, demonstrated that the district court created such an ambiguity in the record as to warrant resentencing.

**B.    Substantive Reasonableness**

Lantigua also challenges the substantive reasonableness of his sentence, which represented a significant upward variance from the top of the applicable guidelines range. He argues that the district court relied on an improper factor—harm to the court—in determining an appropriate sentence. And, he argues, the district court erred in weighing the § 3553(a) factors, placing too little weight on his acceptance of responsibility, length of pretrial detention, and the need for restitution. We address these arguments in turn.

12

*1. Reliance on an Improper Factor*

At sentencing, the district court referenced its involvement in the civil cases arising out of Simpson's attempts to obtain payouts under Lantigua's life insurance policies. Lantigua argues that the district court's statements evidence its reliance on a factor—harm to the court—that is outside the scope of § 3553(a) and that reflected the court's bias against him. Relatedly, he argues that the district court relied on facts from the civil cases that were not incorporated into the record in his criminal case in determining that the court was a victim.

When we place the district court's statements in context, however, we cannot agree that they were improper. The court thoroughly explained that Lantigua had improperly used the judicial system by manipulating lawyers into taking untrue positions and then requiring Lantigua's victims to litigate against Simpson to show she was not entitled to life insurance proceeds. It was only in crafting this explanation that the court mentioned that Lantigua's fraud had touched "this very court." Doc. 52 at 88. The court's fulsome explanation makes clear that it did not consider itself a victim of Lantigua's fraud in the traditional sense; instead, it was accounting for Lantigua's abuse of the judicial system generally as a means to facilitate his fraud.[3]

---

[3] Also based on these comments about the court as a victim, Lantigua argues for the first time on appeal that the district judge was biased and should have recused himself. Because Lantigua failed to seek recusal in the district court, we review only for plain error. *United States*

The district court also noted its familiarity with Lantigua's conduct based on its handling of the civil cases. But Lantigua offers no evidence that the district court actually *relied* on facts or other information from those cases that was not in the record in his criminal case. The record in Lantigua's criminal case supported the district court's determination that Lantigua had abused the judicial system. During the sentencing hearing, and through letters to the district court that were included in the record, Wienckowski, representatives from Fidelity Bank, and representatives from Five Star Insurance discussed the impact of Lantigua's fraud on their lives and businesses and their attempts to recover money through civil proceedings against Simpson. And the district court relied on the PSI, which recounted that Lantigua had enlisted an attorney to help him prepare documents to submit to the life insurance companies to seek death benefits. Thus, we can discern no error.

### 2. *Unreasonable Balancing of Factors*

Lantigua next argues that his sentence is substantively unreasonable because the district court's balancing of the § 3553(a) factors reflected a clear error of

---

*v. Berger*, 375 F.3d 1223, 1227 (11th Cir. 2004) (explaining that an unobjected-to error can be grounds for reversal only if the error is plain, affected the defendant's substantial rights, and seriously affected the fairness, integrity, or public reputation of judicial proceedings). A district judge should disqualify himself if his "impartiality might reasonably be questioned." 28 U.S.C. § 455(a). For the same reasons we described above, the district court's comments were not improper, nor did they evidence partiality. Lantigua therefore cannot show error, plain or otherwise, in the district judge's failure to recuse himself.

judgment. *See Irey*, 612 F.3d at 1189. Although we acknowledge that the district court's sentence varied significantly from the applicable guidelines range, based on its careful and thorough consideration of the § 3553(a) factors, we cannot say the district court's balancing warrants reversal.

First, Lantigua argues that the district court gave inadequate weight to the driver of his applicable guidelines range, the loss amount of his offenses. According to Lantigua, by varying upward as much as it did, the district court imposed a sentence corresponding to a loss amount of $150 million, an amount far higher than the loss amount in his case. We disagree. The district court's upward variance expressly was *not* tied to the guidelines, but rather to the § 3553(a) factors. In imposing the variance, the district court by its own statements intended to account for the nature and circumstances of the offense and Lantigua's history and characteristics, among other § 3553(a) factors, not to account for a greater loss amount.

Second, Lantigua argues that the district court gave too little weight to the fact that he pled guilty and accepted responsibility. And, he argues, the district court provided too little explanation for, and gave too little weight to, the length of his pretrial detention (nearly two years) and the need to provide restitution (which, Lantigua says, could counsel in favor of a shorter term of incarceration to provide for income earning). We reject his arguments. The district court must explain the

15

sentence that it imposes, but that explanation need not be extensive. *See United States v. Dorman*, 488 F.3d 936, 938 (11th Cir. 2007). So we are unconvinced that the district court erred in providing too little explanation for the length of detention and the need to provide restitution.[4]

Moreover, although the district court must consider all of the applicable § 3553(a) factors, *United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009), it need not give all of the factors equal weight. Instead, the sentencing court "is permitted to attach 'great weight' to one factor over others." *Id.* (internal quotation marks omitted). The decision about how much weight to assign a particular sentencing factor is "committed to the sound discretion of the district court." *United States v. Williams*, 526 F.3d 1312, 1322 (11th Cir. 2008) (internal quotation marks omitted). Considering the thoroughness and care with which the district court analyzed the § 3553(a) factors as applied to this case, the court made no clear error of judgment by assigning less weight to Lantigua's acceptance of responsibility and pretrial detention,[5] as well as to the need to provide restitution, and more weight to the other § 3553(a) factors.

---

[4] We also note that the district court discussed with defense counsel Lantigua's ability to pay restitution before delineating and applying the § 3553(a) factors.

[5] The length of pretrial detention and acceptance of responsibility are not expressly delineated in § 3553(a) but arguably are part of the nature and circumstances of the offense, or the history and characteristics of the defendant, § 3553(a)(1).

16

Regardless of whether we would have imposed a similar sentence had we been in the district court's position, the sentence the court imposed was within the bounds of its substantial sentencing discretion, or "in the ballpark of permissible outcomes." *Ledford v. Peeples*, 605 F.3d 871, 922 (11th Cir. 2010). The sentence was not substantively unreasonable.

## IV.    CONCLUSION

Lantigua has failed to demonstrate that his sentence is procedurally or substantively unreasonable. We therefore affirm the sentence the district court imposed.

**AFFIRMED.**