[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 11-16031

_____

D.C. Docket No. 3:11-cr-00009-MMH-TEM-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ARCHERY LYNN OVERSTREET,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(March 28, 2013)

Before CARNES, HULL and FAY, Circuit Judges.

HULL, Circuit Judge:

After a guilty plea, Archery Lynn Overstreet appeals his 420-month sentence

for possessing a firearm while being a convicted felon, in violation of 18 U.S.C.

§ 922(g).  Overstreet's sentence resulted not only from his criminal history, which included two different attempted murder convictions, but also from the district court's finding that he subsequently murdered his wife while absconding from his state parole supervision.  After thorough review of the record and consideration of the parties' briefs, we affirm.[1]

## I.    BACKGROUND FACTS

### A.    The Indictment

A federal grand jury issued a superseding indictment (the "indictment"), charging Overstreet with one count of possessing a firearm while being a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e).  The indictment alleged that Overstreet previously was convicted in Texas state court of five crimes punishable by imprisonment for a term exceeding one year: (1) burglary of a building, committed in July 1983; (2) burglary of a habitation, committed on May 27, 1986; (3) attempted murder, committed on May 27, 1986; (4) aggravated sexual assault, committed on May 28, 1986; and (5) another attempted murder, committed on May 28, 1986.[2]

---

[1]This Court scheduled this case for oral argument.  Subsequently, Overstreet filed an unopposed motion to waive oral argument in light of our recently published decision in United States v. Weeks, No. 12-11104 (11th Cir. Jan. 31, 2013), which disposed of a major issue in Overstreet's appeal, as discussed below.  We granted Overstreet's motion to waive oral argument.

[2]The indictment actually listed the dates of both burglary convictions as October 16, 1986, and the dates of the three other convictions as May 30, 1986.  However, Overstreet's

## B.    Overstreet's Prior Convictions

Overstreet's four most serious prior convictions—burglary of a habitation, two attempted murders, and aggravated sexual assault—stemmed from a crime spree that occurred in Texas on May 27 and 28, 1986.  That crime spree began with burglary, when Overstreet and his brother, Clifford Carter, entered a private home without permission and stole 13 firearms and a car.[3]  Later that evening, Overstreet and Carter were pulled over by two police officers for a seatbelt violation.  As the officers approached the car, both Overstreet and Carter fired handguns at the officers.  One of the officers was grazed by a bullet on his right temple and fell to the ground, but survived.  The officers fired back, and Overstreet and Carter drove off.

Overstreet and Carter then drove to a relative's home in an apartment complex, approximately seven miles away from the place of the police shooting.  They saw a young woman entering her minivan in a parking lot.  Overstreet and Carter entered the minivan, threw the woman into the back, and drove to a secluded area outside of Houston, Texas, near the Brazos River.  They then forced the woman to remove her clothing and raped her twice.  After the rape, Overstreet

---

conviction records, introduced at sentencing, show that the burglary-of-a-building offense occurred in July 1983, and the other four offenses occurred on May 27 and 28, 1986.  Overstreet does not challenge the mistaken dates in the indictment.

[3]We take the facts of Overstreet's prior offenses from the Presentence Investigation Report ("PSI") and the evidence introduced at the sentencing hearing.

and Carter made the woman walk away from the minivan wearing only her bra and underwear. When the woman was approximately 15 feet away from the minivan, Overstreet and Carter each shot her in the back. Four bullets hit the woman, and she fell down an embankment. Overstreet later told the police that the woman was still breathing when he and Carter left her, but they did not shoot her again because they thought she would die anyway. Fortunately, the woman survived. After the assailants left the scene, she managed to crawl to a nearby residence and was taken to a hospital, where she underwent extensive surgery to remove her left kidney, remove a section of her large and small intestines, and repair her lung.

As a result of this crime spree, Overstreet received one conviction for burglary, two convictions for attempted capital murder (for shooting the officer and the woman), and one conviction for aggravated sexual assault. He was sentenced in state court to a total of 60 years in prison.

## C.    The Present Offense

While serving his 60-year sentence in Texas, Overstreet married a long-time friend, Taffy Overstreet ("Taffy"). In 2008, after spending approximately 22 years behind bars, Overstreet was released on parole under strict supervision and went to live with Taffy at her house in Houston. He was 49 years old at the time of his release. As part of his many parole conditions, Overstreet had to wear an

4

electronic monitoring ankle bracelet that would set off an alarm if he left his home between 6:30 p.m. and 9:00 a.m.

On November 8, 2010, at approximately 5:30 a.m., Overstreet cut his electronic ankle bracelet, setting off an alarm, and fled Texas. Around the same time, Taffy disappeared and has not been seen or heard from since. Overstreet was eventually caught on December 8, 2010, in Jacksonville, Florida. Among other things, the police discovered a loaded gun and a roll of blood-stained duct tape in the trunk of the car he was driving.

Overstreet was the prime suspect in Taffy's disappearance, but her body was never found, and Overstreet was not charged with her murder. Rather, Overstreet was indicted in federal court on one count of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). He pled guilty to this firearm offense, but did not admit the existence and nature of his prior convictions, aside from the fact that he had at least one prior felony. Overstreet expressly reserved the right to contest his potential sentencing enhancement under the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e).[4]

At Overstreet's sentencing hearing for the present offense, the district court found that the government proved by a preponderance of the evidence that

[4]Section 924(e) provides for a 15-year mandatory minimum sentence for a felon-in-possession conviction if the defendant "has three previous convictions by any court . . . for a violent felony . . . committed on occasions different from one another." 18 U.S.C. § 924(e)(1).

5

Overstreet murdered Taffy while absconding from parole. We review the initial sentencing calculations, the ACCA objections and rulings, the evidence about Taffy's murder, and then the district court's upward variance to a 420-month sentence.

## D.    Sentencing Guideline Calculations

According to the Presentence Investigation Report ("PSI"), Overstreet's initial base offense level was 24, pursuant to U.S.S.G. § 2K2.1(a)(2). The PSI then classified Overstreet as an armed career criminal under the ACCA and U.S.S.G. § 4B1.4(b) because he had at least three prior convictions for a violent felony. The ACCA classification resulted in an offense level of 33. Overstreet qualified for a total three-level reduction under U.S.S.G. § 3E1.1(a)-(b) for acceptance of responsibility, yielding a total offense level of 30.

Based on his prior convictions and the fact that he was on parole when he committed the present offense, the PSI placed Overstreet into criminal history category V, which, combined with the offense level of 30, resulted in a guideline range of 151 to 188 months' imprisonment. However, the ACCA mandated a minimum sentence of 15 years, or 180 months, and thus Overstreet's guideline range became 180 to 188 months. See 18 U.S.C. § 924(e); U.S.S.G. § 5G1.1(c)(2). The statutory maximum term for Overstreet's offense was life imprisonment. See 18 U.S.C. § 924(e)(1); United States v. Brame, 997 F.2d 1426, 1428 (11th Cir.

6

1993) (holding the statutory maximum sentence under § 924(e) is life imprisonment, even though the statute does not state so expressly).

### E.    Overstreet's Challenge to the ACCA Enhancement

Overstreet filed a sentencing memorandum, objecting to his classification as an armed career criminal.  Overstreet argued that enhancing his sentence under the ACCA violated his constitutional rights because (1) he did not admit to the existence of his prior convictions when pleading guilty; and (2) one of the ACCA elements—that the prior offenses be "committed on occasions different from one another"—should have been, but was not, charged in the indictment and either found by a jury beyond a reasonable doubt or admitted by him in pleading guilty.

At the sentencing hearing, the government introduced documentary evidence showing that (1) Overstreet was, in fact, convicted of five prior felonies, as charged in the indictment, and (2) he committed at least three of those felonies on occasions different from one another.  Overstreet expressly conceded that the evidence presented by the government to prove the existence and nature of his prior convictions came from documents approved by the Supreme Court in Shepard v. United States, 544 U.S. 13, 16, 125 S. Ct. 1254, 1257 (2005) (holding that, in determining the character of a prior conviction under the ACCA, a district court "is generally limited to examining the statutory definition [of the offense of the prior conviction], charging document, written plea agreement, transcript of plea

7

colloquy, and any explicit factual finding by the trial judge to which the defendant assented"). Overstreet argued, however, that both the (1) existence and (2) the different-occasions nature of his prior convictions still needed to be charged in the indictment and either proved beyond a reasonable doubt or admitted during a guilty plea. [5]

The district court overruled Overstreet's objection to the ACCA enhancement, concluding that, under the Supreme Court's decision in Almendarez-Torres v. United States, 523 U.S. 224, 118 S. Ct. 1219 (1998), and this Court's precedent, neither the existence nor the different-occasions nature of his prior convictions needed to be charged in the indictment or proved beyond a reasonable doubt. The district court also found that the government sufficiently proved not only that Overstreet actually committed the prior offenses, but that at least four of those offenses occurred on occasions different from one another. Specifically, while Overstreet's attempted murder of the woman and aggravated sexual assault in 1986 may not have occurred separately, his other prior felonies, including the July 1983 burglary of a building, the May 1986 attempted murder of the officer, and the May 1986 burglary of a habitation, were committed on different occasions.

## F.    Evidence that Overstreet Murdered Taffy

---

[5]Overstreet did not dispute at sentencing, and does not dispute on appeal, that at least three of the five prior convictions proved by government qualified as "violent felon[ies]" under the ACCA. Rather, Overstreet challenges his ACCA enhancement on constitutional grounds only.

8

After the district court overruled Overstreet's ACCA objections at the sentencing hearing, the government introduced (1) the testimony of Sergeant Norman Ruland of the Houston Police Department regarding Taffy's disappearance and the events leading to Overstreet's arrest; and (2) a video recording of Sergeant Ruland's post-arrest interview with Overstreet, which the district court watched almost in its entirety.

According to Sergeant Ruland's testimony, on November 9, 2010, Taffy's son, Shabocker Rawls, reported Taffy missing. Rawls did not live with Taffy, but kept in touch with her regularly. Before her disappearance, Taffy usually contacted her family at least every other day through the telephone or the social networking site Facebook. Taffy was unemployed at the time, and, as her sole means of support, she received food stamps from the government, as well as unemployment benefit payments deposited on a debit card.

Rawls informed Sergeant Ruland that Taffy had called him (Rawls) several times on November 7, 2010, and indicated that she and Overstreet were fighting and that she wanted Overstreet out of her house. During one of those conversations, Rawls heard yelling in the background, and Taffy told him that she bit Overstreet on the lip during a physical altercation.

Sergeant Ruland also interviewed Taffy's uncle and cousin, both of whom had talked to Taffy on November 7, 2010. Taffy called her uncle around noon on

9

November 7, told him that she and Overstreet had been fighting, and asked him to come to her house and remove Overstreet. The uncle came by the house later that day, at approximately 10:00 p.m., but no one answered the door, and Taffy's car was gone. At 10:18 p.m. on November 7, Taffy's cousin called Taffy and talked to her about an upcoming movie. During that conversation, Taffy did not discuss any dispute with Overstreet. In other conversations, however, Taffy had told this same cousin that she had asked Overstreet to move out by December 2010.

Sergeant Ruland reviewed Taffy's debit card and food stamp card records, which indicated that the food stamp card was used on November 7 at approximately 10:00 p.m. at a grocery store near Taffy's house. Sergeant Ruland also discovered that Taffy's last Facebook entry was made at 12:03 a.m. on November 8, 2010. Sergeant Ruland talked to Overstreet's probation officer, who said that, on November 7, he (the probation officer) received the beginning of a voicemail message from Taffy, stating only, "This is Taffy."

Rawls reported to Sergeant Ruland that several items were missing from Taffy's home, including a "couple guns," Overstreet's clothing, and Taffy's car, laptop, debit card, and cell phone. Sergeant Ruland and crime scene technicians searched Taffy's house for evidence of blood, tissue, or human remains, but did not find anything.

Cell phone records proved more fruitful, however.  They showed that, starting on November 8, 2010, Taffy's stolen cell phone traveled southwest of Houston, Texas, to the Brazos River area, where, in 1986, Overstreet and Carter had raped the young woman and left her for dead.  Taffy's phone then traveled east to Jacksonville, Florida, north to New York City, and then back to Jacksonville.  The bulk of the cell phone activity occurred in Jacksonville, and Taffy's debit card was used, or attempted to be used, in Jacksonville 25 times.  Based on this information, Sergeant Ruland contacted the Jacksonville law enforcement authorities, who found Overstreet and arrested him during a traffic stop on December 8, 2010.

As mentioned previously, in the trunk of Overstreet's car, officers found a loaded gun and a roll of duct tape containing a blood stain.  A subsequent DNA analysis determined that the blood likely came from Taffy,[6] although it was unclear how long the blood had been on the tape.

After Overstreet's arrest, Sergeant Ruland came to Jacksonville and interviewed him.  During this video-recorded interview, Overstreet admitted to

---

[6]According to a DNA test report, the bloodstain contained "a mixture of DNA from at least two individuals, with an unknown major female component."  The DNA report concluded that Taffy was the source of the mixture's major component "to a reasonable degree of scientific certainty."  Overstreet's attorney conceded at the sentencing hearing that the blood was probably Taffy's.

absconding from parole and stealing Taffy's belongings, but he denied killing Taffy.

## G.    District Court's Sentencing Findings

At the conclusion of the sentencing evidence, the government argued that Overstreet murdered Taffy, and asked the district court "to impose a sentence at the high end of what Congress has authorized, which is life in prison in this case." Overstreet responded that, although Taffy was missing, there was insufficient evidence to show that she was dead or that he murdered her. Overstreet requested a sentence within the guideline range.

After the parties completed their arguments, the district court recounted the evidence presented at the sentencing hearing and found that Overstreet was not credible in his recorded post-arrest interview. The district court observed: "Mr. Overstreet's demeanor, when asked if he killed his wife or why he killed her, was quite telling. There was absolutely no emotion whatsoever." The district court concluded that, by "far greater than a preponderance of the evidence," Overstreet either killed Taffy or "kidnapped her and left her for dead."

The district court then determined that a one-level upward departure was appropriate under U.S.S.G. § 4A1.3 because Overstreet's criminal history category of V substantially underrepresented the seriousness of his actual criminal history. The district court stated that, while it "certainly had other individuals with longer

criminal histories, [it] ha[d] never seen an individual with such a serious criminal history." The district court noted that Overstreet was on probation during the 1986 crime spree, and that he was on parole when he committed the present firearm offense. Accordingly, the district court departed upwards to place Overstreet into a criminal history category of VI, which, combined with an offense level of 30, resulted in a new guideline range of 180 to 210 months' imprisonment. The district court stated, however, that it would impose the same sentence even without the upward departure.

The district court then imposed a sentence of 420 months in prison and 5 years of supervised release. The district court explained in detail why this far-above-guideline sentence was warranted considering the 18 U.S.C. § 3553(a) factors. Among other things, the district court found "that Mr. Overstreet is an extremely dangerous individual with little or no regard for the law or for human life other than his own," and that this finding "is entirely evident from the actions that resulted in his prior convictions." The district court also found that the nature and circumstances of Overstreet's present offense were "extremely serious," given that he had a significant criminal record and possessed the firearm while absconding from parole. Moreover, the need for a sentence to reflect the seriousness of the offense, provide just punishment for the offense, and promote respect for the law, "which Mr. Overstreet has shown he has none," called for "an

13

extremely serious sentence in this case." The district court also suggested that this case presented no unwarranted sentencing disparity because the court "never had a defendant with such a record."

The district court then stressed the factors of deterrence and the need to protect the public from further crimes of defendant Overstreet, stating that these two factors warranted "a significant upward variance" and that any lesser term of imprisonment "would be absolutely insufficient." The district court explained that Overstreet had served 22 years in the Texas prison system for his 1986 crime spree, yet this time in prison did not deter him from escaping parole, stealing his wife Taffy's belongings, and arming himself. Thus, it was unclear "what sentence could deter him from future criminal conduct." The district court concluded that "no sentence short of one that is tantamount to a life sentence would be sufficient to achieve the statutory purposes of sentencing in this case, not on these facts and not with this defendant."

The district court stated that it would impose the same 420-month sentence even if it did not consider the fact that Overstreet killed Taffy. The court explained that it might have imposed an actual life sentence if Overstreet had been charged with killing Taffy and if the government proved the murder beyond a reasonable doubt. However, the district court reaffirmed its previous finding of murder, stating: "I'm not only convinced that Mr. Overstreet killed his wife, but I'm

14

extraordinarily troubled that he has shown absolutely no remorse, emotion, or concern about her at all."

After the district court imposed the 420-month sentence, Overstreet stated that he wished to raise all of his previously made sentencing objections. This appeal followed.

## II.    DISCUSSION

### A.    ACCA Enhancement

On appeal, Overstreet argues that his ACCA enhancement was unconstitutional because (1) he did not admit the existence of his prior predicate convictions when he pleaded guilty, and (2) the fact that his prior offenses were "committed on occasions different from one another" should have been alleged in the indictment and proven beyond a reasonable doubt.[7]  Both of Overstreet's arguments are foreclosed by binding precedent.

First, Overstreet himself concedes, and we agree, that the Supreme Court's decision in Almendarez-Torres forecloses his argument that the existence of his prior convictions needed to be admitted in his guilty plea or otherwise proven beyond a reasonable doubt.  See Almendarez-Torres, 523 U.S. at 226-27, 118 S. Ct. at 1222 (holding that, for sentence enhancement purposes, the fact of a defendant's prior conviction did not need to be alleged in the indictment or proved

---

[7]We review constitutional errors in sentencing de novo, but will not reverse if the error is harmless beyond a reasonable doubt.  United States v. Paz, 405 F.3d 946, 948 (11th Cir. 2005).

15

beyond a reasonable doubt where the fact of a prior conviction was not an element of the present offense); United States v. Beckles, 565 F.3d 832, 846 (11th Cir. 2009) (holding that, under Almendarez-Torres, "the government need not prove beyond a reasonable doubt that a defendant had prior convictions . . . in order to use those convictions to enhance a defendant's sentence" under the ACCA).

Second, regarding the different-occasions element, this Court has previously concluded that a district court does have authority to determine "the factual nature" of prior convictions for ACCA purposes, "including whether they were committed on different occasions," so long as the court limits itself to Shepard-approved documents.  United States v. Weeks, No. 12-11104, slip op. at 6-7 (11th Cir. Jan. 31, 2013); see also United States v. Sneed, 600 F.3d 1326, 1332-33 (11th Cir. 2010) (stating that, in determining whether prior offenses were committed on different occasions, a district court "may look to certain facts underlying the prior conviction[s]," although it must use only Shepard-approved sources); United States v. Greer, 440 F.3d 1267, 1275 (11th Cir. 2006) (holding that Almendarez-Torres permits a district court to determine not only the existence of prior convictions under the ACCA, but the "nature" of those convictions as well); United States v. Spears, 443 F.3d 1358, 1361 (11th Cir. 2006) (rejecting, on plain-error review, the notion that the different-occasions determination under the ACCA must be submitted to a jury and proved beyond a reasonable doubt).

16

Overstreet argues that the Supreme Court's decision in Nijhawan v. Holder, 557 U.S. 29, 129 S. Ct. 2294 (2009), abrogated our prior holdings on the different-occasions issue, and now requires the separateness of prior offenses to be alleged in the indictment and proved beyond a reasonable doubt. We reached the opposite conclusion in Weeks. There, we explained that "Nijhawan merely implies that an immigration court's findings may not provide a constitutional basis for later sentencing enhancements if they are not appropriately limited to Shepard sources." Weeks, No. 12-11104 at 8. "Nijhawan does not even suggest that circumstance-specific determinations made for ACCA purposes must be proven to a jury beyond a reasonable doubt . . . ." Id. at 8-9. Therefore, we held that a district court "ha[s] the authority to apply the ACCA enhancement based on its own factual findings" that the defendant's offenses were committed on occasions different from one another. Id. at 9.

Given our precedent, the district court in this case committed no constitutional error in sentencing Overstreet as an armed career criminal. See id.; 18 U.S.C. § 924(e)(1).

**B.    Reasonableness of Overstreet's Sentence**

We review "all sentences—whether inside, just outside, or significantly outside the Guidelines range—under a deferential abuse-of-discretion standard."

17

Gall v. United States, 552 U.S. 38, 41, 128 S. Ct. 586, 591 (2007).[8]  First, we determine whether the district court committed any "significant procedural error" and, second, whether the sentence was "substantively reasonable under the totality of the circumstances."  United States v. Turner, 626 F.3d 566, 573 (11th Cir. 2010).  "A sentence may be procedurally unreasonable if the district court improperly calculates the Guidelines range, treats the Guidelines as mandatory rather than advisory, fails to consider the appropriate statutory factors, selects a sentence based on clearly erroneous facts, or fails to adequately explain the chosen sentence."  United States v. Gonzalez, 550 F.3d 1319, 1323 (11th Cir. 2008).  "The review for substantive unreasonableness involves examining the totality of the circumstances, including an inquiry into whether the statutory factors in § 3553(a) support the sentence in question."  Id. at 1324.

If the district court determines that a sentence outside the guideline range is appropriate, "it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." United States v. Williams, 526 F.3d 1312, 1322 (11th Cir. 2008) (internal

---

[8]The government argues that we should review the reasonableness of Overstreet's sentence for plain error because he failed to object to that sentence.  We disagree.  Before being sentenced, Overstreet expressly asked the court to sentence him within the applicable guideline range, and, after being sentenced, stated that he wished to raise all of his previously-made sentencing objections.  Therefore, Overstreet has adequately preserved the issue of reasonableness for appellate review.  See United States v. Hoffer, 129 F.3d 1196, 1202 (11th Cir. 1997) (stating that a party preserves a sentencing objection by raising it "at some point during the sentencing hearing").

18

quotation marks omitted). Even where the degree of the variance is substantial, we will not reverse a sentence unless "we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir. 2009) (internal quotation marks omitted).[9]

In challenging the reasonableness of his sentence, Overstreet argues that the district court improperly sentenced him as if he was convicted for the disappearance and death of Taffy, even though he was only convicted for illegally possessing a firearm. Overstreet contends that Taffy's disappearance was unrelated to his felon-in-possession offense, and that punishing him for her murder violated the principle espoused by the Constitution and the Guidelines that he be sentenced only for the firearm offense of conviction and related conduct. Overstreet concedes that his role in Taffy's disappearance could be considered for

---

[9]Under § 3553(a), a sentencing court must impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing set forth in § 3553(a)(2), which include the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, deter criminal conduct, and protect the public from the defendant's further crimes. 18 U.S.C. § 3553(a)(2). Other factors to be considered in imposing a sentence include the nature and circumstances of the offense, the history and characteristics of the defendant, the available sentences, the applicable guideline range, the need to avoid unwarranted sentence disparities, and the need to provide restitution to victims. Id. § 3553(a)(1), (3)-(7).

purposes of sentencing under the post-<u>Booker</u>[10] advisory guideline regime, but stresses that the district court placed excessive weight on his purported murder of Taffy.

As an initial matter, the district court's finding—that the government proved by a preponderance of the evidence that Overstreet murdered Taffy—was not clearly erroneous.[11] Overstreet does not dispute the sufficiency of that evidence on appeal. The following non-exhaustive list of circumstantial evidence led the district court inescapably to that finding: (1) Taffy disappeared on the same day, November 8, 2010, that Overstreet cut his ankle monitor and absconded from parole; (2) the day before her disappearance, Taffy told a relative that she was fighting with Overstreet and wanted him out of her house; (3) when he absconded, Overstreet took Taffy's car, perhaps her guns, her cell phone, laptop, and her only means of support—the food stamp card and the debit card; (4) before heading to Jacksonville, Florida, after absconding, Overstreet drove to the area near the Brazos River in Texas where he had raped and shot a young woman in May 1986; (5) Overstreet used Taffy's debit card 25 times in Jacksonville, even though he must have known that she would report the card as stolen if she was alive; (6) when Overstreet was arrested in Jacksonville, a gun and a roll of duct tape with

---

[10]<u>United States v. Booker</u>, 543 U.S. 220, 125 S. Ct. 738 (2005).

[11]We review a district court's fact findings at sentencing only for clear error. <u>United States v. Lebowitz</u>, 676 F.3d 1000, 1015 (11th Cir. 2012).

Taffy's blood were found in the trunk of the car he was driving; and (7) although Overstreet denied murdering Taffy during his interview with Sergeant Ruland, the district court reviewed the video-taped interview and found that Overstreet's demeanor and lack of emotion cast serious doubt on his credibility.[12]

Furthermore, we recognize that the district court did not find Overstreet's offense of conviction—possession of a firearm by a convicted felon—to be connected to Taffy's murder.[13] However, as Overstreet concedes, the district court was still entitled to consider the murder in deciding whether to vary outside the guideline range. The fact that Overstreet killed Taffy in the process of absconding from parole is directly germane to several § 3553(a) factors, including the "history and characteristics of the defendant," and the need for the sentence to "promote respect for the law," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant." See 18 U.S.C. § 3553(a)(1)-(2).[14]

_____

[12]We recognize that the district court stated that it would have imposed the same sentence even without considering Taffy's murder. Because the district court's consideration of the murder was proper, we need not, and do not, decide whether the 420-month sentence would have been reasonable otherwise.

[13]The government had earlier objected to Overstreet's offense level as calculated in the PSI, arguing that his initial offense level should have been 34 rather than 33, pursuant to U.S.S.G. § 4B1.4(b)(3)(A), because Overstreet possessed the gun "in connection with" a crime of violence, i.e., Taffy's murder. The district court overruled the government's objection at sentencing, finding that there was insufficient evidence to show that Overstreet possessed the gun "in connection with" Taffy's murder. The district court reasoned that there was no evidence as to how Taffy was killed or how Overstreet came to possess the gun, aside from Overstreet's statement that the gun belonged to Taffy's son Rawls.

[14]We point out that the concept of "relevant conduct" under U.S.S.G. § 1B1.3 pertains to determining the appropriate offense level, which is then used to calculate the guideline range. In

21

The question becomes, then, whether the district court placed undue weight on the murder.  We think not.  Obviously, the fact that Overstreet murdered his wife and stole her belongings to escape parole not only casts a very negative light on Overstreet's character, but also demonstrates the need for a lengthy sentence to protect the public from the defendant.

Overstreet's dangerous nature is further reflected in his criminal history— another factor heavily emphasized by the district court.  Although four of Overstreet's five prior convictions occurred as a result of a two-day crime spree, that crime spree was exceptionally violent and heinous.  Overstreet and his brother Carter (1) stole 13 guns and a car from a residence; (2) shot at police officers who stopped them, hitting one in the head; and (3) kidnapped a young woman, brutally raped her twice, and shot her in the back multiple times.  Overstreet and Carter did not finish that murder only because they thought the woman was going to die anyway, although, contrary to their expectations, she miraculously survived.  Needless to say, Overstreet's and Carter's conduct showed an incredibly cold-

---

contrast, here, even if Overstreet's murder of Taffy was completely unrelated to his offense of conviction, this conduct may be considered as part of the defendant's "history and characteristics" and other § 3553(a) factors and, thus, may be considered in imposing a variance. See United States v. Amedeo, 487 F.3d 823, 830 (11th Cir. 2007) (holding that this Court's pre-Booker mandate to consider only "relevant conduct" in calculating the defendant's sentence "did not apply to the district court's imposition of a variance based on § 3553(a)").

blooded disregard for human life, which made Overstreet's illegal possession of the firearm all the more troubling.

Overstreet contends that, in focusing on his past criminal conduct, the district court lost sight of the mild nature of the offense of conviction. Overstreet notes that he was stopped in Jacksonville without incident, consented to the search of his car, acknowledged possession of the single gun found in the trunk of his car, and pled guilty to the offense. Overstreet also argues that the district court placed undue emphasis on the need for deterrence and the fact that he was on parole when he committed the offense of conviction.

Overstreet's arguments are wholly unpersuasive. Although the district court must evaluate all § 3553(a) factors in imposing a sentence, it is "permitted to attach 'great weight' to one factor over others." See Shaw, 560 F.3d at 1237; see also United States v. Clay, 483 F.3d 739, 743 (11th Cir. 2007) ("The weight to be accorded any given § 3553(a) factor is a matter committed to the sound discretion of the district court . . . ." (internal quotation marks omitted)).

In this particular case, given Overstreet's murder of Taffy and his past violent criminal conduct, the need for deterrence and public protection were entitled to great weight. Overstreet was punished with a 60-year total sentence for his 1986 crime spree. After serving 22 years of that sentence in state prison, at age 49, Overstreet received another chance at life in society and was released on parole

23

under strict conditions.  Yet the time Overstreet spent in prison, his advancing age, and the intensive parole supervision had no deterrent effect on his violent nature and willingness to kill.  Two years after being released, at age 51, he murdered his wife Taffy, stole her car and personal belongings, and absconded from parole while in possession of a loaded firearm.  All of this shows that virtually no amount of time in prison would deter Overstreet from committing violent crimes, and that he would still present a grave danger to the public if released from prison, no matter how restrictive his conditions of release might be.

Overstreet's cooperation with police after his arrest in Jacksonville does not mitigate the need for deterrence and protection of the public.  Overstreet may well have cooperated with police after his 1986 crime spree and during his subsequent time in prison.  This did not necessarily mean that Overstreet was no longer willing to kill or commit other crimes, given that he murdered Taffy, absconded from parole, and illegally possessed a loaded gun.  In light of these particular facts, Overstreet's cooperation with the police in Jacksonville has little or no bearing on his propensity to violate the law.  Thus, the district court acted well within its discretion in saying that no sentence short of one that amounts to life imprisonment would ensure adequate deterrence and protect the public from Overstreet's further crimes.

24

As another challenge to the weight given to his criminal history, Overstreet argues that the district court essentially triple-counted his prior convictions by using them to (1) enhance his sentence under the ACCA and "shatter" the otherwise-applicable mandatory minimum, (2) depart upwards one criminal history category under § 4A1.3, and (3) vary upwards from the guideline range. This argument is meritless.

The ACCA mandates a particular statutory sentencing range (15 years to life imprisonment) for defendants with three previous violent felony convictions, and nothing in our case law prohibits a district court from considering the nature of those prior convictions to determine the appropriate sentence within that statutory range. Indeed, this Court has previously stated that "a district court can rely on factors in imposing a variance that it had already considered in imposing [a guideline] enhancement." United States v. Rodriguez, 628 F.3d 1258, 1264 (11th Cir. 2010).[15]

For all of the above reasons, the district court did not abuse its discretion in weighing the § 3553(a) factors and imposing an above-guideline sentence of 420

[15]We also note that the district court's upward departure under U.S.S.G. § 4A1.3 to criminal history category VI, imposed due to Overstreet's prior convictions and his status as a parolee when he committed the present offense, had no effect on Overstreet's sentence. The court stated that it would have imposed the same 420-month sentence even without that departure. Accordingly, any alleged error in using Overstreet's prior convictions to depart upwards under § 4A1.3 was harmless. See United States v. Barner, 572 F.3d 1239, 1248 (11th Cir. 2009) ("A Sentencing Guidelines miscalculation is harmless if the district court would have imposed the same sentence without the error.").

months in prison.  See Shaw, 560 F.3d at 1237; Clay, 483 F.3d at 743.  In fact, we have previously affirmed as reasonable upward variances of similar extent.  See United States v. Early, 686 F.3d 1219, 1221-23 (11th Cir. 2012) (affirming a 210-month sentence for bank robbery despite the guideline range of 78 to 97 months); Shaw, 560 F.3d at 1239-41 (upholding a 120-month sentence for a felon-in-possession conviction where the guideline range called for 30 to 37 months); United States v. Amedeo, 487 F.3d 823, 827-28, 834 (11th Cir. 2007) (upholding a 120-month sentence for cocaine distribution where the guideline range was 37 to 46 months); United States v. Turner, 474 F.3d 1265, 1273-74, 1281 (11th Cir. 2007) (affirming a 240-month sentence for mail theft and related offenses despite a guideline range of 51 to 63 months).

**AFFIRMED.**