**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-11672

Non-Argument Calendar

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

SHAWN RUARK,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:21-cr-00218-WFJ-AAS-17

————————————

Before LAGOA, ABUDU, and WILSON, Circuit Judges.

PER CURIAM:

Shawn Ruark appeals his 180-month sentence for two counts of assault in aid of racketeering activity. On appeal, Ruark makes two arguments: (1) the district court clearly erred in

applying U.S.S.G. § 2A2.2(b)(1); and (2) his sentence is substantively unreasonable. After careful consideration, we find no merit to either of these arguments, so we affirm.

## I. FACTUAL BACKGROUND & PROCEDURAL HISTORY

In March 2023, a federal grand jury charged Ruark and eight other defendants with various racketeering related offenses. Ruark was charged with two counts of assault in aid of racketeering activity, 18 U.S.C. §§ 1959(a)(3) & 2, in Counts 12 and 13 of the indictment. Ruark pled guilty to both counts without a plea agreement.

At the change-of-plea hearing, the government summarized the factual basis for the plea as follows. Ruark was a member and associate of a group called "the Unforgiven," which is "a violent, white-supremacist organization whose activities affected interstate and foreign commerce." The government explained that the ideals of Unforgiven were:

> Propagating Aryan philosophy;
>
> Preserving and expanding the power, territory, and reputation of the enterprise through recruitment, indoctrination of white supremacist ideology, pursuit of business and political leadership, intimidation, and threats and acts of violence;
>
> Keeping rivals in fear of the enterprise and in fear of its members and associates through threats and acts of violence;

> Enriching the members and associates of the enterprise through, among other things, distribution of weapons, narcotics, and contraband;

> Creating a front to resist and rebel against a perceived constant and almost brutal victimization of whites in the Florida Department of Corrections; and

> Protecting enterprise members by concealing, destroying evidence of, and threatening or retaliating against witnesses to its illegal activities.

Members of the Unforgiven engaged in racketeering, including acts and threats involving murder, kidnapping, and robbery in support of these ideals. They also committed "violence against perceived racial enemies" and members "who failed to abide by the [Unforgiven's] constitution and bylaws." The Unforgiven perceived cooperation with law enforcement as one of the most serious violations of its code and would punish members who committed that violation with extreme violence.

Ruark's two convictions arose from violent assaults on two other Unforgiven members, C.S. and W.H. As for Count 12, on July 25, 2020, Unforgiven members gathered in Satsuma, Florida, and one member presented information that C.S. was using narcotics in violation of the Unforgiven's rules. One Unforgiven member ordered three men, including Ruark, "to repossess C.S.'s patch," which identified him as a member of the group. Ruark and the others traveled to C.S.'s house in Lake City, Florida. Once there, the men "forced entry into C.S.'s home" then "beat C.S. and used

a knife to cut C.S.'s patch, which was a tattoo . . . on C.S.'s upper back at the base of his neck." While leaving C.S.'s residence, the men remarked that they were "your neighborhood white supremacists."

Regarding Count 13, the Unforgiven believed another member, W.H., also violated the group rules. Members confronted W.H. in July 2020 and sought to "forcibly defac[e]" the tattoos that marked him as a member of the group. The men, including Ruark, attacked W.H and struck him "with hands and weapons." Another member threatened to burn W.H.'s tattoos off with a torch. W.H. ultimately let the men cover his tattoo, fearing he would be killed if he did not. After hearing this factual basis and informing Ruark of the consequences of his plea, the district court accepted the guilty plea.[1]

In advance of sentencing, a probation officer prepared a presentence investigation report ("PSI") that elaborated on the Unforgiven and Ruark's offense conduct. Members of the Unforgiven are "required to carry out acts of extreme violence to gain entry into the gang," are "required to get tattoos such as swastikas, iron crosses, and lightning bolts," and are required to attend regular meetings. At some of these meetings, members vote on appropriate punishment for those who violate the organization's code and whether to revoke their membership. The PSI reiterated that Unforgiven members have engaged in "acts and threats involving

---

[1] On appeal, Ruark does not challenge his conviction or the plea colloquy.

murder, kidnapping, robbery, distribution and possession of controlled substances, obstruction of judice, and tampering of witnesses, victims, or informants."

Regarding the attack of C.S., the PSI reported that the Unforgiven members forced entry into C.S.'s home by striking C.S. in the head with the butt of a shotgun. The PSI stated that the assault left C.S. with a permanent scar on his forehead. Regarding the assault on W.H., the PSI explained that one Unforgiven member struck W.H. in the head with brass knuckles and another hit him with a metal cane. One member threatened to burn W.H.'s tattoo off with a torch or remove it with a straight razor. Ultimately the men held W.H. down and lit the torch, but they were interrupted by W.H.'s roommate. After one member brandished a firearm, W.H.'s roommate retreated, and the members held W.H. down while Ruark covered the tattoo with a tattoo gun. W.H. was left with visible scarring on his neck. As a result, W.H. believed the Unforgiven wanted to kill him and he fled the state. Ruark did not object to the PSI's descriptions of the offense conduct.

The PSI calculated a total offense level of 27. As part of this calculation, the PSI added an enhancement under U.S.S.G. § 2A2.2(b)(1) for each Count because the assaults involved more than minimal planning. Ruark then received seven criminal history points, putting him in a criminal history category of IV. Specifically, the PSI assigned Ruark: (1) three criminal history points for a 2007 conviction for obstructing/resisting an executive officer; (2) three criminal history points for a 2013 conviction for

unlawfully possessing a firearm and ammunition as a convicted felon; and (3) one criminal history point for a 2022 conviction for simple assault. The PSI noted that Ruark had several convictions which did not lead to criminal history points under the Sentencing Guidelines. These included convictions for theft, assault with a deadly weapon, false identification to a peace officer, possession of controlled substance—paraphernalia, carjacking, and possessing, manufacturing, or selling a dangerous weapon. With a criminal history category of IV and an offense level of 27, the PSI calculated Ruark's guidelines range to be 100 to 125 months' imprisonment. *See* U.S.S.G. Ch. 5 Pt. A. The PSI also noted that the maximum term of imprisonment was 20 years per count.

The PSI contained personal and family data about Ruark. It explained that Ruark was raised in poverty by his mother in Los Angeles, California and that she was physically abusive. Ruark left the home at age 13. Ruark's father passed away at the age of 33 from cancer and his mother died at age 48. The PSI also noted that Ruark had various medical issues, including diabetes, post-traumatic stress disorder, and substance abuse issues.

The government had no objections to the PSI. Ruark objected to the two-level increases under § 2A2.2(b)(1). He argued that there was not more than minimal planning regarding the assault of C.S. because the Unforgiven members did not take significant steps to conceal the offense or their own identities. He also argued that the offense was "spontaneously proposed" and not repeated—*i.e.,* it was separate and distinct from the assault against

W.H. As for the assault of W.H., Ruark argued that there was only "bare necessity" planning because members were selected at the group meeting, the tools discussed were typical tools of assault, no identities were concealed, and there was a witness to the assault.

At sentencing, the district court heard argument on Ruark's objection to the PSI. Ruark reiterated that the assaults were done without "a lot of planning and brainpower" and that, even though their conduct was "obviously violent and illegal . . . there was quite a bit of knee jerk reaction in response to what they were told to do" by Unforgiven leadership. As to the C.S. assault, Ruark again argued that there were no efforts at concealing identities, the men simply "drove up to the residence, stormed the home, took the individual . . . and then ultimately they conducted the crime . . . ." He asserted that this was not "well calculated," but rather a situation where they decided "we're going to do this, let's go do this, and so they went."

Regarding the assault of C.S., the district court explained that it had "been more than once bass fishing near Satsuma" and that it was "quite certain" that the drive between Satsuma to Lake City takes over 90 minutes. However, the court warned, "don't quote me," as it had not consulted an atlas. In addition, the men "had to gather up" and "[t]here was a meeting and then the vote or the discussion in Satsuma, and then they had to make arrangements to meet and to drive" to Lake City. Ruark also brought a shotgun and the men met up in Lake City in several cars. For "[o]ne of the gentlemen, his girlfriend or wife drove and waited

there."   Accordingly, the court found that there was more than minimal planning.  As to the W.H. assault, the district court noted that someone brought a tattoo gun and one "other fellow . . . brought the hand torch and turned it on or lit it" and someone else brought brass knuckles.  Therefore, the court overruled the objection to that assault as well.  Ruark did not object further to the court's ruling or rationale.

After it overruled the only remaining objection, the court adopted the PSI and concluded that Ruark's advisory guidelines range was 100 to 125 months' imprisonment, to be followed by one year of supervised release.  The government argued that the district court should vary upward and impose a sentence of 210 months. It argued that the nature and circumstances of the offense were highly aggravating, and the crime was "violence for the sake of violence."  Moreover, it explained that the Unforgiven were "organized" and "used sophisticated communication platforms that were aimed at avoiding detection" in order "to raise an army of sorts to go out and do their bidding."  In this context, Ruark was "tasked with enforcing the objectives of the Unforgiven."

The government noted that the two assaults were "among some of the most brutal [crimes] the court heard during trial," referencing the trial of Ruark's codefendants.  The government then summarized evidence from trial and noted that in both cases, the Unforgiven committed violence in the victim's homes, "the place that they should have been safe against attacks like the brutal ones [Ruark] carried out."   Further, it pointed to Ruark's lengthy

criminal history and history of violence, including aggravated assault, carjacking, and weapons charges and that, while in prison, he became a member of the Unforgiven. It also stated that there was evidence that Ruark's wife made calls to the leader of the Unforgiven. Next, the government highlighted that Ruark had "not cooperated with law enforcement in any way, shape, or form," and "ha[d] in no way assisted law enforcement, [and] ha[d] not sought to assist law enforcement." Instead, it contended Ruark had "no intention to change what has been demonstrated through his history to be a pattern of life that poses a danger to the community." The government emphasized that Ruark "stands before [the court] emboldened, prepared to go into people's homes armed with firearms, as a felon who's been convicted of that same offense, and to commit absolutely brutal crimes for no reason other than his ideology. He's a terrorist. He's a danger to the community."

Ruark argued for leniency. He explained that he came "from a broken home," lost his father when he was young and had no other support from family members. He also stated that he was "accepting full responsibility" for his actions. Accordingly, he asked for a guidelines sentence, explaining that "all of his conduct ha[d] been accounted for within the sentencing guidelines." He also noted that he was 46 years old and that he would be in his mid-fifties by the time he was released even if he received a guidelines sentence. Ruark then gave an allocution and apologized for his conduct and for hurting his family.

After it heard the parties' arguments, the district court explained that it had planned to sentence Ruark to 240 months' imprisonment but would give "somewhat less" in light of the allocution. The court noted that Ruark had several prior crimes and parole violations, brought a gun to one of the assaults, and participated in the other assault. It stated that it "just boggles anyone's mind that somebody would bring a blowtorch to an assault" and "it's . . . hard to even put your head around that." It noted that some people get the death penalty for robberies gone wrong, which is violence, "but this is just something else." It explained that the "cutting up" of the victim's neck was "just violence for its own sake, to terrorize people." The court stated that "to reflect the nature of the offense and the offender and to protect the record from what is a bad record," it would give Ruark an upward variance.

The court sentenced Ruark to 180 months' imprisonment, to be followed by three years of supervised release. It reiterated that the variance was justified by the need for the sentence "to reflect the offense and the offender and to protect the public from further crimes, the gratuitous, terroristic nature of the violence and the lengthy firearms and violent history" Ruark had already committed. The court subsequently entered judgment to this effect, and Ruark appealed.

## II. STANDARDS OF REVIEW

We follow a "two-step process" when reviewing a sentence. *United States v. Trailer*, 827 F.3d 933, 935 (11th Cir. 2016). First, we

review the sentence for procedural reasonableness. In doing so, we determine "whether the district court committed any significant procedural error, such as miscalculating the advisory guideline range . . . , failing to consider the 18 U.S.C. § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence." *Id.* at 936. We review *de novo* the proper interpretation and application of the Sentencing Guidelines. *United States v. Pulido*, 133 F.4th 1256, 1279 n.20 (11th Cir. 2025). However, we review findings of fact for clear error. *United States v. Mandhai*, 375 F.3d 1243, 1247 (11th Cir. 2004).

A court may base its factual findings at sentencing on facts admitted in the defendant's guilty plea, undisputed statements in the PSI, or evidence presented at the sentencing hearing. *United States v. Matthews*, 3 F.4th 1286, 1289 (11th Cir. 2021). "The court may also make reasonable inferences from the evidence." *Id.*; *see United States v. Philidor*, 717 F.3d 883, 885 (11th Cir. 2013) (explaining that a district court at sentencing can make inferences "based on common sense and ordinary human experience"); *United States v. Chavez*, 584 F.3d 1354, 1367 (11th Cir. 2009) (explaining that a court may rely on "reasonable inference[s]," but not ones that are "speculative to the point of being clearly erroneous"). "There is no requirement that sentencing judges confine their consideration to empirical [evidence] and ignore what they have learned from similar cases over the years." *United States v. Brenes-Colon*, 136 F.4th 1343, 1346 (11th Cir. 2025) (quoting *United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009)).

In the second step of our "two-step process," we review "whether the sentence is substantively reasonable in light of the totality of the circumstances and the § 3553(a) factors." *Trailer*, 827 F.3d at 935–36. "In reviewing the [substantive] reasonableness of a sentence, we will not substitute our own judgment for that of the sentencing court and we will affirm a sentence so long as the court's decision was 'in the ballpark of permissible outcomes.'" *United States v. Butler*, 39 F.4th 1349, 1355 (11th Cir. 2022) (quoting *United States v. Rosales-Bruno*, 789 F.3d 1249, 1257 (11th Cir. 2015) (Opinion of E. Carnes, J.)). A party arguing a sentence is unreasonable bears "the burden of establishing the sentence is unreasonable in light of the record and the § 3553(a) factors." *United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008).

Issues raised for the first time on appeal are reviewed only for plain error. *United States v. Clark*, 274 F.3d 1325, 1326 (11th Cir. 2001). "To establish plain error, a defendant must show that there was an (1) error, (2) that is plain, and (3) that affects substantial rights." *United States v. Utsick*, 45 F.4th 1325, 1332 (11th Cir. 2022). "Where *all three* conditions are met, we may then exercise our discretion to notice a forfeited error, but only if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (emphasis added).

### III. DISCUSSION

#### A. The District Court did not Clearly Err in Applying U.S.S.G. § 2A2.2(b)(1).

Ruark first contends that the district court incorrectly calculated his guidelines range by applying a two-level increase under U.S.S.G. § 2A2.2(b)(1). He first argues the district court erred in basing its decision on the court's personal experience as to the distance between Satsuma and Lake City, given that the government presented no evidence on that issue at sentencing. He notes that there were no steps taken to conceal identity or hide evidence in the assault of C.S. He therefore contends that the planning for the assault against C.S. was "typical for the commission of the offense in a simple form." Ruark argues the same points about the assault of W.H. The government asserts that the district court did not clearly err as "[t]hese were deliberate planned attacks; not spur of the moment assaults."

The Sentencing Guidelines provide for a two-level increase to the offense level when an assault involves "more than minimal planning." U.S.S.G. § 2A2.2(b)(1). According to the commentary, "more than minimal planning" means that the offense involved more planning than would be necessary to commit the offense in a "simple form." *Id.*, comment. (n.2).[2] The commentary gives

[2] We have held that courts "may not defer" to the Sentencing Guidelines commentary "if uncertainty does not exist" in the Guidelines themselves. *United States v. Dupree*, 57 F.4th 1269, 1275 (11th Cir. 2023) (*en banc*). Still, where—as here—both parties rely on the commentary and no party contests the

14                          Opinion of the Court                    24-11672

certain examples of what might constitute "more than minimal planning," such as "luring the victim to a specific location" or "wearing a ski mask to prevent identification." *Id.* An "enhancement for more than minimal planning is an acknowledgement that 'purposeful criminal conduct demands greater punishment' than conduct undertaken without 'the opportunity to consider the criminality of the act and its consequences.'" *United States v. Crawford*, 407 F.3d 1174, 1180 (11th Cir. 2005) (quoting *United States v. Scroggins*, 880 F.2d 1204, 1213 (11th Cir. 1989)).

Applying an older version of the minimal-planning enhancement, we reversed a district court's minimal planning enhancement in sentencing a defendant found guilty of beating a government informant. *United States v. Tapia*, 59 F.3d 1137, 1144 (11th Cir. 1995). We determined that the lack of evidence showing "repeated acts over a period of time" with the goal of assaulting the inmate rendered the district court's decision clearly erroneous. *Id.* On the other hand, in *United States v. Jenkins*, we affirmed a district court's minimal planning enhancement in a bank robbery case in which the bank's vault was left open accidentally when the defendant committed the theft. 901 F.2d 1075, 1084 (11th Cir. 1990). The district court reasonably had determined that the quick manner in which the defendant moved the stolen goods was an indication of prior planning. *Id.*

---

commentary's interpretation, we retain the discretion to look to the commentary as well. *United States v. Jews*, 74 F.4th 1325, 1327-28 & n.2 (11th Cir. 2023).

In the instant case, Ruark has not shown clear error. *Mandhai*, 375 F.3d at 1247. Ruark's contention—that there was not more than minimal planning because the Unforgiven did not conceal their identities, hide evidence, or repeat their behavior - misinterprets the Guidelines commentary. The commentary lists concealing identities or evidence as examples of facts that would indicate, although not necessarily constitute, more than minimal planning. *See* U.S.S.G. § 2A2.2, comment. (n.2). Moreover, contrary to Ruark's argument, the assaults in this case comprise repeated behavior in a broad sense because both assaults occurred after the Unforgiven discussed and decided to assault members who violated the group's rules. The record also supports the court's findings regarding each individual assault.

As for the assault on C.S., the Unforgiven members had to drive from Satsuma to Lake City—which the district court estimated takes over 90 minutes—which was sufficient time to consider criminality of the act and its consequences. *See Crawford*, 407 F.3d at 1180. Although Ruark argues the court improperly relied on its own personal experience driving to Satsuma, courts are allowed to rely on "common sense and ordinary human experience" when evaluating evidence. *Philidor*, 717 F.3d at 885. Moreover, Ruark does not suggest the court's comments were "speculative to the point of being clearly erroneous," given he never challenged the court's estimate as to the length of the drive. *Chavez*, 584 F.3d at 1367.

As for the assault on W.H., the district court did not err in concluding that the member's decisions to bring brass knuckles, a blow torch, and a tattoo gun represented more than minimal planning. Unlike *Tapia*, where the defendant never asked to be housed with the inmate he eventually assaulted, the Unforgiven members sought out W.H. and decided who would participate in the attack and how they would do so. U.S.S.G. § 2A2.2(b)(1); *Tapia*, 59 F.3d at 1144. The record showed that the members gathered to coordinate stripping W.H. of his Unforgiven tattoos themselves, and they brought a blowtorch to burn the tattoos off, showing more than assault "in a simple form." U.S.S.G. § 2A2.2, comment. (n.2).

The clear error standard is a deferential one and requires the district court's finding to provide us with a "definite and firm conviction that a mistake has been committed." *United States v. Isaac*, 987 F.3d 980, 990 (11th Cir. 2021) (citation omitted); *see also OHI Asset (VA) Martinsville SNF, LLC v. Wagner (In re Wagner)*, 115 F.4th 1296, 1303 (11th Cir. 2024). In addition, applying § 2A2.2(b)(1) is consistent with the purpose of the enhancement itself, which is designed to acknowledge "that 'purposeful criminal conduct demands greater punishment than conduct undertaken without 'the opportunity to consider the criminality of the act and its consequences.'" *Crawford*, 407 F.3d at 1180 (quoting *Scroggins*, 880 F.2d at 1213). The assaults here were clearly purposeful and Ruark and his codefendants had ample opportunities to consider the criminality and wrongfulness of their conduct.

Accordingly, we affirm Ruark's challenge to the § 2A2.2(b)(1) enhancements.

### B. Ruark has not shown his Sentence is Substantively Unreasonable.

Next, Ruark asserts that his sentence was substantively unreasonable because the prosecutor "repeatedly referred to testimony" presented at his co-defendants' trial which he had no opportunity to rebut or confront through cross-examination, in violation of his due process rights. He also argues that the blowtorch should not have counted as an aggravating factor because he was not the one who brought it. Finally, he argues that the extent of the variance was unreasonable, in part because the district court relied heavily on his criminal history, which he contends was already "thoroughly accounted for in the calculating of the advisory sentencing range."

The government responds that, given the aggravating facts of the crime, Ruark's history of violence and firearms possession, and that the guidelines range was inadequate to address the severity of his crime, his sentence is reasonable. It also argues that, to the extent any review of the trial testimony is warranted, it should be subject to plain error review because Ruark failed to preserve that challenge.

As a threshold matter, we reject a portion of the government's preservation argument because Ruark did advocate for a lower sentence, thus preserving his sentencing challenge. *See Holguin-Hernandez v. United States*, 589 U.S. 169, 171, 175 (2020).

However, his freestanding constitutional argument regarding the use of trial testimony from his codefendants' trial was not preserved below, so we review the issue only for plain error. *Clark*, 274 F.3d at 1326; *Utsick*, 45 F.4th at 1332.[3]  Under that standard, Ruark has not shown reversible error, for several reasons. First, the case Ruark relies on notes that "evidence presented at the trial of another may not—without more—be used to fashion a defendant's sentence *if the defendant objects*."  *United States v. Castellanos*, 904 F.2d 1490, 1496 (11th Cir. 1990) (emphasis added).  As noted, Ruark did not object here, so *Castellanos* does not show plain error in considering the prosecutor's unobjected-to comments.  Ruark also has not shown these comments affected his substantial rights because the district court did not rely on them in explaining its sentence and Ruark did not point to any stated fact that was incorrect or could have been contested if he had an opportunity for cross-examination. *Utsick*, 45 F.4th at 1332.  Even if a defendant should be allowed cross-examination regarding statements like these, *see Castellanos*, 904 F.2d at 1496, Ruark has not shown reversible plain error.

Section 3553(a) requires that a district court "impose a sentence sufficient, but not greater than necessary," to accomplish multiple goals, including: "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; and

---

[3] It is also unclear whether this argument is better characterized as a procedural reasonableness challenge, but the distinction does not matter here.

to protect the public from further crimes . . . ." 18 U.S.C. § 3553(a), (2)(A)-(C).  A sentencing court also must consider the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the guideline sentencing range; and the need to avoid unwarranted sentencing disparities among defendants with similar records who have been convicted of similar conduct.  *Id.* § 3553(a)(1), (3)-(4), (6).

Though the district court must consider all relevant § 3553(a) factors, "the weight given to each factor is committed to the sound discretion of the district court," and it may attach great weight to one factor over the others.  *Butler*, 39 F.4th at 1355.  District courts may also impose upward variances based on the § 3553(a) factors.  *United States v. Overstreet*, 713 F.3d 627, 637–38 (11th Cir. 2013).  "[A] sentencing court may impose an upward variance based upon uncharged conduct as it relates to the history and characteristics of the defendant, as well as the need to promote respect for the law, afford adequate deterrence, and protect the public."  *Butler*, 39 F.4th at 1355.  It may also do so if it finds "the Guidelines range was insufficient in light of a defendant's criminal history."  *Id.*  "[D]istrict courts are afforded 'broad leeway in deciding how much weight to give to prior crimes the defendant has committed.'"  *Id.* (quoting *Rosales-Bruno*, 789 F.3d at 1261).

"A district court making an upward variance must have a justification compelling enough to support the degree of the variance . . . ."  *United States v. Dougherty*, 754 F.3d 1353, 1362 (11th Cir. 2014).  Still, we will vacate an upward variance sentence "only if

'we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case.'" *United States v. Early*, 686 F.3d 1219, 1221 (11th Cir. 2012) (quoting *Shaw*, 560 F.3d at 1238). One sign of reasonableness is that the sentence is well below the statutory maximum. *United States v. Riley*, 995 F.3d 1272, 1278 (11th Cir. 2021).

On the facts of this case, we find no abuse of discretion. There is ample support in the record for the district court's decision that an upward variance was appropriate. The district court explained that both Ruark's history and the nature of the crimes were extremely aggravating. *See* 18 U.S.C. § 3553(a), (2)(A)-(C); *Overstreet*, 713 F.3d at 637–38. We have explained that these considerations can justify an upward variance. *See Riley*, 995 F.3d at 1280 ("Violent offenders are often good candidates for upward variances."); *cf. also United States v. Schmidt*, 930 F.3d 858, 868 (7th Cir. 2019) ("[The defendant's] radical belief in the superiority of one race over all others, and his communication of that belief . . . revealed the danger of returning him to society" and "the expression of these desires, combined with a record of repeated violations of law, evinced a willingness to continue on a path of lawlessness in the absence of significant correction.").[4]    While the court put

---

[4] *See also United States v. Mikkelson*, No. 24-11393, 2025 WL 1939105, at *5-7 (11th Cir. July 15, 2025) (unpublished) (holding Ruark's codefendant's upward variance sentence to be substantively reasonable); 18 U.S.C. § 3553(a)(6)

significant weight on Ruark's criminal history and the severity of the offense—which the district court found to be "gratuitous" and "terroristic"—those factors were extremely aggravating and relevant here and the court's focus does not represent an abuse of discretion. *Butler*, 39 F.4th at 1355. Moreover, the sentence was well below the statutory maximum, *Riley*, 995 F.3d at 1278, and shorter than the government's proposed sentence.

To the extent that Ruark argues the district court should not have considered his codefendant's conduct during the assault on W.H.—*i.e.*, that a blowtorch was used during the attack—this did not make the sentence unreasonable. The Unforgiven members planned the attack on W.H. before committing it and so it is reasonable to infer that they discussed bringing a blowtorch and other means to remove W.H.'s tattoos. In light of that fact, the district court permissibly considered the totality of the circumstances of the assault in its determination of the severity of the offense conduct. *See* U.S.S.G. § 1B1.13; 18 U.S.C. § 3553(a). Nor is there any reason to think that Ruark was unaware of the plan to remove W.H.'s tattoos—the PSI states that Ruark himself covered the Unforgiven patch on W.H.'s neck with a tattoo. *Matthews*, 3 F.4th at 1289.

At bottom, the district court had broad discretion to fashion an appropriate sentence and Ruark has not shown this upward variance sentence "was [not] 'in the ballpark of permissible

---

(directing courts to consider "the need to avoid unwarranted sentence disparities among defendants . . . who have been found guilty of similar conduct").

outcomes.'"  *Butler*, 39 F.4th at 1355 (quoting *Rosales-Bruno*, 789 F.3d at 1257); *see Gonzalez*, 550 F.3d at 1324.

### IV. CONCLUSION

For the reasons stated, we affirm Ruark's sentence.

**AFFIRMED.**