[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-10917
Non-Argument Calendar
_____

D.C. Docket No. 1:12-cr-00362-CAP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES E. DAVIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(December 16, 2013)

Before HULL, JORDAN and FAY, Circuit Judges.

PER CURIAM:

James Earl Davis appeals the district court's revocation of his supervised release and imposition of a 36-month sentence, pursuant to U.S.C. § 3583(e)(3). After review, we affirm.

## I.  BACKGROUND

### A.    Supervised Release

In 2007, Davis pled guilty to aiding and abetting bank fraud, in violation of 18 U.S.C. §§ 2 and 1344, and was sentenced to 63 months' imprisonment and three years of supervised release.  Conditions of Davis's supervised release included, inter alia, prohibitions against: (1) leaving the judicial district without permission of the court or the probation officer, and (2) opening new lines of credit without approval of the probation officer, as well as requirements to: (3) truthfully answer the probation officer's inquiries and (4) follow the probation officer's instructions.

After completing his prison term, Davis began his supervised release on May 12, 2011.  On October 15, 2012, Davis moved the district court (then the Eastern District of Virginia) for permission to travel to Rhode Island to attend a custody hearing for his child, whom he believed was being abused.  His motion stated that his probation officer had denied his requests.  Davis attached a copy of the summons from the Rhode Island family court for hearings on November 9, 2012, and January 15, 2013.

2

On October 31, 2012, the district court denied Davis's motion to travel without prejudice and transferred jurisdiction of Davis's supervised release to the Northern District of Georgia.  On November 5, 2012, the district court in the Northern District of Georgia denied Davis's motion, "[a]fter carefully considering [Davis's] motion, together with consulting with the probation officer."

## B.    Petition for Revocation

On January 16, 2013, Davis's probation officer, David Mitchell, petitioned for Davis's arrest and for revocation of his supervised release.  The petition alleged, inter alia, that Davis had obtained car loans without Officer Mitchell's approval (Charge 1), had travelled to Rhode Island on January 15, 2013 without prior approval of the court or Officer Mitchell (Charge 3), and on December 3, 2012 had refused to answer Officer Mitchell's questions, stating instead that he was "a sovereign citizen" and did not recognize his federal sentence (Charge 4).[1]

Prior to the revocation hearing, Davis, although represented by counsel, filed several pro se motions, including a motion to dismiss for lack of jurisdiction and a motion asking the district court, Judge Charles Pannell, to recuse.  Davis's motion to dismiss argued that the district court did not have jurisdiction over Davis because he was a "Sovereign Citizen" who owned the "entity JAMES E DAVIS." Davis attached UCC Financing Statements that listed "JAMES EARL DAVIS JR."

---

[1]The government did not pursue Charge 2, which alleged that Davis had failed to participate in mental health treatment.

as the debtor and James Earl Davis Jr. as the secured party. The motion to dismiss asked the court several questions, including whether Judge Pannell had taken an oath of office. The motion to recuse alleged that Judge Pannell had violated his oath of office and had conspired with Officer Mitchell to violate Davis's constitutional rights.

## C.    Revocation Hearing

On March 1, 2013, the district court held a revocation hearing. At the outset, the district court indicated that it had received mail from Davis, as a "secured party," most of which had also been included in Davis's pro se motions. The district court confirmed that, through his pro se motions, Davis wanted the court to grant him a copyright over his name spelled in capital letters so Davis could then prevent the court from using his name. The district court denied all of Davis's pro se motions.

The district court also denied Davis's oral motion to discharge his appointed counsel and represent himself, but agreed to let Davis proceed with "hybrid representation." When Davis asked the district court whether it had taken an oath of office, the district court stated it was "not answering those questions" from Davis's pro se motions, finding that the questions were "frivolous" and intended "to harass the Court."

4

Davis denied Charges 1, 3, and 4.  Over Davis's hearsay objection, the government introduced documents from an auto dealership indicating that a man named James Earl Davis had purchased a 2007 BMW with financing from Independent Bank.  Many of the various documents listed James Earl Davis's residence as 5009 Galleon Crossing in Decatur, Georgia and contained a signature of the buyer, James Earl Davis.

Among the documents were: (1) a signed title and tag application for the BMW that listed James Earl Davis as the owner of the vehicle and Independent Bank as the security/lien holder on the vehicle; (2) a certificate of title for the BMW indicating it was last transferred from the dealership to James Earl Davis on October 17, 2012 and signed by "James Earl Davis" as the buyer; (3) a bill of sale indicating James Earl Davis purchased the BWM from the dealership on October 17, 2012 for $22,795 and signed by Davis as the buyer; (4) a "deal summary" and a retail sales installment contract reflecting that James E. Davis had purchased the BMW with a $1,600 cash down payment and had financed $22,795 at a 13.49% interest rate; (5) a signed "DealerTrack" application for credit by James Davis to purchase the BMW, which stated that Davis was employed at World Wide Enterprise as a consultant making $4,000 a month; (6) an application status report indicating that James Davis's application for credit to buy the BMW was made to Independent Bank; (7) a tax and tag receipt from the State of Georgia and a

5

verification of insurance from Progressive Insurance, both indicating that Independent Bank was the lienholder on the BMW; and (8) a photocopy of a driver's license, the condition of which is so poor neither the writing nor the picture can be seen.

The government called Brian Brooks, the employee at the dealership who had prepared the car purchase documents. When asked whether he recognized Defendant Davis as the man for whom he had prepared the documents, Brooks said, "I imagine, yes, but it's been awhile," and added that he was not "a hundred percent certain." Brooks explained that he ordinarily made a copy of the buyer's driver's license and ensured that it was for the person completing the forms.

Officer Mitchell testified that Davis obtained the loan to purchase the BMW in October 2012 without first obtaining his approval. In November 2012, Officer Mitchell and another probation officer met with Davis at his residence to discuss the new lines of credit. Davis was hostile and would not cooperate. On December 3, 2012, Officer Mitchell again met with Davis to discuss the car loan and Davis's "overall attitude." Davis stated that he was a "sovereign citizen" and would not answer any questions unless Officer Mitchell first answered a questionnaire. Officer Mitchell testified that he did not fill out Davis's questionnaire because it "[s]eemed a harassing technique."

Officer Mitchell identified several documents containing Defendant Davis's signature, including Davis's judgment and commitment and correspondence Davis had sent to the Probation Office between September and November 2012. In a September 5, 2012 letter to Officer Mitchell's supervisor, Davis complained about Officer Mitchell denying his request to travel to Rhode Island. The letter accused Officer Mitchell of discriminating against Davis based on race and then retaliating against Davis when Davis complained about the discrimination. The letter stated that Davis had filed a civil rights lawsuit against Officer Mitchell, and attached a copy stamped filed on June 12, 2012. Davis requested that the supervisor assign him a new probation officer due to the conflict of interest.

In an October 15, 2012 letter to Officer Mitchell, Davis stated that he "did not wish to do business with" Officer Mitchell and informed Officer Mitchell that in future Officer Mitchell would be billed $500,000 for each time Officer Mitchell used Davis's name, which Davis claimed was copyrighted. Davis attached copies of UCC Financing Statements, signed by Davis.

Davis also sent Officer Mitchell a "Notice and Demand," notarized and dated November 30, 2012, demanding that Officer Mitchell answer a series of questions. This correspondence accused Mitchell of, among other things, violating his oath of office and of discriminating against Davis.

7

Officer Mitchell testified that he first discussed with Davis his concerns about his son's safety in June 2012, after Davis had reported those concerns to the Rhode Island police. Davis told Officer Mitchell that his son's stepfather, who was white, had used racial slurs about Davis's son in a telephone call. Around that time, Davis first asked Officer Mitchell if he could travel to Rhode Island. Later, in January 2013, Davis filed his complaint in Rhode Island family court, alleging that his son was being abused by his stepfather. A copy of Davis's Rhode Island complaint was admitted into evidence.

Davis subsequently made numerous requests for permission to travel to Rhode Island to represent himself in family court. In their last conversation, Officer Mitchell encouraged Davis to either obtain an attorney to represent him or, if he represented himself pro se, to appear via teleconference or video conference. Officer Mitchell stated that he never gave Davis permission to leave the district. The government introduced a copy of a transcript showing that Davis appeared in person at the January 15, 2013 hearing in Rhode Island.

After Davis did not report to Officer Mitchell as directed in December 2012 or February 2013, Davis was arrested. On February 27, 2013, a few days prior to the revocation hearing, Officer Mitchell received correspondence from Davis, entitled "Default Affidavit," sent from the detention facility. This document referenced Davis's October and November 2012 letters and stated that Officer

8

Mitchell was in "default" and owed Davis $3,290,000 for violating Davis's constitutional rights.

In response to the district court's questions, Officer Mitchell stated that while under supervision, Davis resided with his mother at 5009 Galleon Crossing in Decatur, Georgia. At the time, Davis was unemployed, on disability, and receiving government assistance. Davis never reported to Officer Mitchell that Davis was employed by Worldwide Enterprises as a consultant making $4,000 a month. When Officer Mitchell contacted the building where the loan application indicated Worldwide Enterprises was located, the manager told Officer Mitchell that there was no such business.

Maddie Gaines, Davis's mother, testified that when either she or Davis called Davis's son in Rhode Island, his stepfather would answer the telephone and would use racial slurs against them and against Davis's son. Davis introduced a recording of one of these telephone conversations, which was played for the court. Gaines said that the telephone conversation occurred in November 2012.

Gaines said that she was in the room when Davis called to ask if he could appear telephonically in the Rhode Island family court. Gaines said Davis was told that he had to appear in person. Upon the district court's questioning, Gaines admitted that the Rhode Island Juvenile Court Services investigated the home in Rhode Island and gave a favorable report to the family court.

9

At the close of the evidence, Davis's counsel indicated that Davis did not dispute that he went to Rhode Island without permission to attend the hearing. Davis's counsel stressed that Davis had shown that his fears for his child in Rhode Island were well-founded, the probation office had not taken Davis's concerns as seriously as it should have, and Davis had tried to appear at the Rhode Island hearing telephonically. Davis's counsel further stated that she did not have any argument as to Charges 1 and 4, but noted, as mitigation, that Davis had complied with his monthly reporting requirements and suffered from a seizure disorder.

## D.    District Court's Findings and Sentence

The district court found that Davis had violated the conditions of supervised release by opening lines of credit, leaving the district without permission, and failing to truthfully answer Officer Mitchell's questions at the December 3, 2012 meeting and instead harassing and obstructing Officer Mitchell.

The district court determined that Davis's guidelines range was 8 to 14 months and that his statutory maximum prison term was 36 months. Davis asked for a sentence at the low end of the guidelines range. As mitigating factors, Davis pointed out that Davis: (1) "did not respond in any kind of violent manner" regarding his son; (2) pursued the legal remedy suggested by his probation officer; and (3) had asked to appear telephonically at the hearing, but was not allowed.

The district court imposed a 36-month sentence. As its reasons for the sentence, the district court stated that Davis: (1) had "demonstrated that he has no desire to abide by the terms of his supervised release"; (2) had "engaged in a pattern of conduct to obstruct the probation officer and the Court"; and (3) presented "a danger to the community by engaging in conduct to defraud creditors by falsely listing Worldwide Enterprise as an employer to gain credit to buy this automobile." The district court noted that in the car loan documents, Davis had listed Worldwide Enterprises as his employer making $4,000 a month, when the evidence showed that was not true. The district court stated it "believe[d] that [Davis], without further incarceration, will engage in similar conduct in the future."

Davis's counsel objected to the length of the sentence and to the fact that Davis had not been allowed to allocute. The district court then allowed Davis to allocute. Among other things, Davis said he believed the sentence was excessive given that he had tried to get permission from the probation office to leave the district. The district court then re-imposed the 36-month sentence and repeated its explanation for the sentence. Davis again objected to the length of the sentence.

## II.  DISCUSSION

**A.    Sufficiency of the Evidence as to Charge 1**

Davis argues that the district court's finding that he opened a new line of credit was not supported by substantial evidence.  Under 18 U.S.C. § 3583(e), a district court may revoke a defendant's term of supervised release upon finding by a preponderance of the evidence that the defendant violated a condition of supervised release.  18 U.S.C. § 3583(e)(3). [2]

Here, sufficient evidence supported the finding that Davis purchased a 2007 BMW by obtaining financing through the dealership and Independent Bank.  The government introduced numerous documents related to the purchase and financing of the BMW in Davis's name.  Officer Mitchell testified that Davis did not get his approval before applying for this line of credit with Independent Bank.

Davis contends that the government's evidence did not show that he was the James Earl Davis reflected in the documents.  We disagree.  Brian Brooks testified that he believed Davis was the man for whom he prepared the car loan documents. Although Brooks stated that he could not be "a hundred percent certain," other circumstantial evidence corroborated Brooks's testimony that Defendant Davis was the man who purchased the BMW with the car loan.  First, the buyer James Earl Davis's personal information in the car purchase documents was the same as

[2]We ordinarily review a district court's revocation of a supervised release term for an abuse of discretion, United States v. Frazier, 26 F.3d 110, 112 (11th Cir. 1994), and the district court's fact findings for clear error, United States v. Alamand, 992 F.2d 316, 318 (11th Cir. 1993).  During the revocation hearing, however, Davis objected to only the length of his sentence and not to the revocation of his supervised release or to the district court's fact findings. Accordingly, we review for plain error.  See United States v. Gresham, 325 F.3d 1262, 1265 (11th Cir. 2003).

Defendant Davis's information, such as his address at 5009 Galleon Crossing in Decatur, Georgia and his date of birth. Second, the buyer James Earl Davis's signature appeared to match Defendant Davis's signature.

The government introduced, and Officer Mitchell identified, the judgment and commitment from Davis's original conviction, as well as several letters sent from Davis to the probation office, all of which were signed by Davis. This evidence was sufficient to allow the district court to compare Davis's known signatures with the buyer's signatures on the car purchase documents. Moreover, the signatures of the car buyer James Earl Davis appear to be very similar, if not identical, to the known signatures of Defendant Davis. This evidence was sufficient to support a finding that Defendant Davis completed the paperwork to obtain the loan and purchase the car. Under these circumstances, the district court did not err, much less plainly err, in finding that Davis opened a new line of credit in violation of his supervised release condition.

## B.    First Amendment Claim as to Charge 3

For the first time, Davis argues that the district court's finding that Davis violated a condition of supervised release by leaving the district to attend the family court hearing in Rhode Island infringed his First Amendment right to access

13

to the courts.[3]  Because Davis did not raise his constitutional argument at his revocation hearing, our review is limited to plain error.  See Gresham, 325 F.3d at 1265.  Under this standard, Davis must show that: "(1) an error occurred; (2) the error was plain; (3) it affected his substantial rights; and (4) it seriously affected the fairness of the judicial proceedings."  Id.  Here, even assuming arguendo that Davis could satisfy the first prong of the plain error test, he has not shown either that the alleged error was plain or that it affected his substantial rights.

First, Davis does not cite any Supreme Court or Eleventh Circuit precedent establishing that a finding of a violation of supervised release in the circumstances Davis presented would impermissibly infringe a defendant's right to court access.  "It is the law of this circuit that, at least where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it."  United States v. Lejarde-Rada, 319 F.3d 1288, 1291 (11th Cir. 2003).

Davis cites Ex Parte Hull, but that case is not like Davis's case and does not establish plain error.  In Ex Parte Hull, the Supreme Court invalidated a state prison regulation that required prisoners to submit their court pleadings to prison officials to determine if they were "properly drawn."  The Supreme Court

---

[3]Contrary to the government's contentions, Davis's counseled brief does not challenge either his original travel condition or the denial of his travel request.  Rather, Davis argues only that, given the circumstances, the district court's finding at the revocation hearing that Davis violated the travel condition infringed his constitutional right to court access.

14

concluded that the prison regulation abridged a habeas petitioner's right to apply to federal court.  Ex Parte Hull, 312 U.S. 546, 548-49, 61 S. Ct. 640, 641-42 (1941).  Ex Parte Hull did not involve a district court's finding that a defendant on supervised release had violated a standard travel condition to prosecute a family court petition and thus does not "directly resolv[e]" the issue presented here.

In any event, Davis cannot demonstrate that he was prejudiced by the alleged error.  "An error that affects substantial rights is one that affected the outcome of the district court proceedings."  United States v. Henderson, 409 F.3d 1293, 1308 (11th Cir. 2005) (internal quotation marks omitted).  To show prejudice, the defendant must show "a reasonable probability of a different result."  United States v. Rodriguez, 398 F.3d 1291, 1299 (11th Cir. 2005).  Davis cannot meet this standard because any single Grade C violation can be the basis for revoking a term of supervised release and imposing a prison term.  See U.S.S.G. §§ 7B1.3(a)(2), 7B1.4(a).

Charges 1, 3, and 4 are all Grade C violations.  See U.S.S.G. § 7B1.1(a)(3)(B).  The district court found that in addition to violating the travel condition (Charge 3), Davis violated two other conditions by opening lines of credit (Charge 1) and failing to answer his probation officer's questions (Charge 4).  Thus, each violation provided a sufficient basis for revoking Davis's supervised release and imposing a sentence.  See United States v. Brown, 656 F.2d

15

1204, 1207 (5th Cir. 1981) (providing that where there is a sufficient ground to justify revocation, we need not consider possible error in the other grounds).[4] Davis has not pointed to any evidence that, absent the finding that Davis violated the travel condition (Charge 3), the district court would not have revoked his supervised release and imposed a 36-month prison term.

Davis does not challenge the district court's finding with respect to Charge 4, and his challenge to the district court's finding as to Charge 1 lacks merit for the reasons discussed above. Thus, the district court's decision to revoke Davis's supervised release term is sufficiently supported by its findings that Davis was guilty of Charges 1 and 4. In addition, the district court, in explaining its decision to impose an upward variance, focused on Davis's conduct related to Charges 1 and 4 and did not mention Davis's unauthorized travel outside the district, suggesting that Charge 3 was not a significant factor in Davis's sentence.

## C.    Reasonableness of Davis's 36-month Sentence

Before imposing a prison term upon revocation, the district court must consider certain factors in 18 U.S.C. § 3553(a). See 18 U.S.C. § 3583(e).[5] The

---

[4]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit decided on or before September 30, 1981.

[5]Specifically, in a revocation proceeding, the relevant factors the district court must consider are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to afford adequate deterrence, protect the public, and provide the defendant with needed educational or vocational training and medical

16

district court also must consider the policy statements in Chapter 7 of the Sentencing Guidelines, which provide recommended, non-binding ranges of imprisonment. United States v. Silva, 443 F.3d 795, 799 (11th Cir. 2006).

"We review the sentence imposed upon revocation of supervised release for reasonableness." United States v. Velasquez Velasquez, 524 F.3d 1248, 1252 (11th Cir. 2008). Our reasonableness review applies the deferential abuse of discretion standard. Gall v. United States, 552 U.S. 38, 41, 46, 128 S. Ct. 586, 591, 594 (2007). In reviewing for reasonableness, we first consider whether the district court committed any significant procedural error and then whether the sentence is substantively unreasonable in light of the relevant § 3553(a) factors and the totality of the circumstances. United States v. Pugh, 515 F.3d 1179, 1190 (11th Cir. 2008).[6] The party challenging the sentence has the burden to show it is unreasonable. United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005).

If the district court decides to impose an upward variance, "it must 'consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.'" United States v. Williams, 526 F.3d 1312, 1322 (11th Cir. 2008) (quoting Gall, 552 U.S. at 50, 128 S. Ct. at 597).

---

care: (3) the Sentencing Guidelines range and pertinent policy statements of the Sentencing Commission; (4) the need to avoid unwarranted sentence disparities; and (5) the need to provide restitution. See 18 U.S.C. § 3582(e) (cross-referencing 18 U.S.C. § 3553(a)(1), (a)(2)(B)-(D), (a)(4)-(7)).

[6]Davis does not raise any procedural error with respect to his sentence.

17

However, we will vacate such a sentence "only if we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." United States v. Shaw, 560 F.3d 1230, 1238 (11th Cir. 2009) (internal quotation marks omitted).

Davis has not shown that his 36-month sentence is substantively unreasonable. The parties agree that, with a Grade C violation and a criminal history category of VI, Davis's recommended guidelines range under Chapter 7 was 8 to 14 months. See U.S.S.G. § 7B1.4(a). Because Davis's underlying offense of bank fraud was a Class B felony, Davis's statutory maximum prison term upon revocation was three years. See 18 U.S.C. § 3583(e)(3).

The district court concluded that an upward variance to the statutory maximum of 36 months was warranted because: (1) Davis had engaged in a pattern of conduct to obstruct the probation officer and the court; and (2) Davis posed a danger to the public because he had "engag[ed] in conduct to defraud creditors" by falsely listing his employment and income on the car loan application. The record amply supports the district court's reasons for the variance.

In addition to his underlying bank fraud offense, Davis has an extensive criminal history of fraud involving falsifying identification and cashing counterfeit or forged checks. At the revocation hearing, the government presented evidence

18

that Davis falsely indicated on his car loan application that he was employed at Worldwide Enterprises as a consultant making $4,000 per month.  In fact, no such company existed, and Davis was actually unemployed and receiving disability benefits.  Based on Davis's history of fraud and the evidence that he had engaged in further fraud with creditors while on supervised release, the district court permissibly concluded that Davis was likely to engage in such behavior again and that it needed to protect the public from Davis.  See U.S.S.G. § 7B1.4, cmt. n.3 (explaining that when the Grade C violation "is associated with a high risk of new felonious conduct, . . . an upward departure may be warranted").

With respect to Davis's obstructive conduct, the record reflects that Davis sent harassing letters to Officer Mitchell and the officer's supervisor.  These letters accused Officer Mitchell of racial discrimination and unlawful retaliation, threatened to bill Mitchell for using Davis's name on any documents, and demanded that Mitchell fill out a questionnaire that insinuated that Mitchell was violating his oath of office and discriminating against Davis.  At the revocation hearing, the district court indicated that Davis sent a similar questionnaire to the court, which the district court found was frivolous and meant to harass.  Davis also sent correspondence to Mitchell stating that Mitchell owed Davis $3,290,000 for violating Davis's constitutional rights.

19

In addition, Davis was hostile towards Officer Mitchell on more than one occasion and would not answer Mitchell's questions. Davis also failed to report on two occasions when instructed to do so by Mitchell.

Under the totality of the circumstances, we cannot say the district court's decision to impose a 36-month sentence was an abuse of discretion.

**AFFIRMED.**